Brian S. King, #4610
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
nediha@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JONATHAN Z., and DANIEL Z.,<br><br>Plaintiffs,<br><br>vs.<br><br>OXFORD HEALTH PLANS,<br><br>Defendant. | SECOND AMENDED COMPLAINT<br><br>2:18-cv-00383 EJF |

Plaintiffs Jonathan Z. ("Jonathan"), and Daniel Z. ("Daniel"), through their undersigned

counsel, complain and allege against Defendant Oxford Health Plans ("OXP") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Jonathan and Daniel are natural persons residing in Fairfield County, Connecticut

   Jonathan is Daniel's father.

2. OXP is the insurer for the New York City Specialized Dentistry Benefits Plan ("the

   Plan") and provides medical and mental healthcare coverage to Jonathan and Daniel.

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et.*

   *seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Jonathan is a

   participant in the Plan and Daniel is a beneficiary of the Plan.

4. Daniel received medical care and treatment at Open Sky Wilderness Therapy, ("Open

   Sky") a licensed and accredited outdoor behavioral health program that offers mental

1

health services to adolescents between the ages of 13-18. Open Sky operates in Utah during the Autumn and Winter months and operates in Colorado during the Spring and Summer.

5. Daniel also received medical care at Crossroads Academy, ("Crossroads") a licensed residential treatment center in Utah that specializes in treating adolescent boys with a dual diagnosis of substance use and mental health disorders.

6. Additionally, Daniel received medical care at Aim House, a young adult treatment facility in Colorado that provides a structured environment designed to help ease the transition from residential treatment and wilderness programs to independent living.

7. OXP denied Jonathan's claims for payment of Daniel's medical expenses in connection with his treatments at Open Sky, Crossroads, and Aim House. This lawsuit is brought to obtain the Court's order requiring OXP to pay the expenses incurred during Daniel's respective treatments.

8. This Court has jurisdiction of this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because OXP does business in the State of Utah. In addition, much of the treatment at issue took place in Utah. Finally, the Plaintiffs wish to maximize the likelihood that the sensitive nature of the mental health treatment provided for Daniel will not become publicly known and believe the likelihood of maintaining his privacy is increased by bringing their claim in Utah.

10. The remedies Jonathan and Daniel seek under the terms of ERISA and under the Plan are for the benefits due and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental

Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## BACKGROUND FACTS

### Daniel's Developmental and Medical Background

11. Daniel's biological mother was homeless and used drugs and alcohol during her pregnancy. After Daniel was born, he was adopted by Jonathan and his wife.

12. When Daniel was 12 years old, his parents caught him smoking marijuana. In an effort to curb Daniel's drug habit, Jonathan enrolled Daniel in a new school. Daniel's drug use continued to escalate over time, and by the time he was 14, he was drinking alcohol at school and abusing painkillers. Daniel was caught dealing drugs at school and was expelled.

13. After he was expelled, Daniel went to the same high school as his old drug friends. Daniel went to family therapy twice a week and started working with a drug counselor, but he continued to abuse drugs, and had frequent angry outbursts. In November of 2012, Daniel was admitted to Greenwich Hospital after he became very angry and threatened to kill himself with a kitchen knife.

14. Daniel became very confrontational and got into frequent fights with his parents. He had low self-esteem, executive functioning issues, and also suffered from ADHD.

15. Daniel would skip classes to get high with friends. His mother twice had to pick him up early from his high school after he was suspected of dealing drugs there. Daniel engaged in frequent vandalism and graffiti, and often lost his temper, punching holes in walls and doors. Daniel's drug habit was so severe that he passed out in the middle of math class after taking six Xanax tablets.

16. Daniel was again admitted to Greenwich Hospital after the police were called to deal with his drunken fits of anger at a party. From there Daniel was transferred to Four Winds Hospital where he was diagnosed with anxiety and depression.

17. Daniel began meeting with a psychiatrist for his mental health issues, but he stopped going after a few months, when the psychiatrist told Jonathan that he couldn't help Daniel until he got his substance use problems under control.

18. Daniel started working with another therapist in Connecticut. He enrolled in college, but hardly ever went to class, as he had difficulty waking up after spending so much time drinking and getting high. Daniel passed out in the student center after taking too much Xanax. He later angrily called his parents to report that someone had stolen the drugs out of his backpack while he was unconscious. In November of 2014 Daniel was arrested outside of a concert for possession of Methylenedioxymethamphetamine ("Molly").

19. Daniel's parents gave him an ultimatum. They told him that he either had to go to a treatment program or they would kick him out of the house. After angrily leaving the house for ten days, Daniel consented to go to a wilderness program.

### Open Sky

20. On the advice of Daniel's therapist Jayne Eliach, RN, MS, Daniel was admitted to Open Sky on January 8, 2015.

21. Ms. Eliach wrote in an undated letter, "…After his first semester in college, family tension and substance abuse continued. I recommended Daniel attended Open Sky Wilderness Program. It was my strong opinion that Daniel not return home after completing the program."

22. Daniel was discharged from Open Sky on April 7, 2015.

23. An Explanation of Benefits statement dated May 7, 2015, denied payment for Daniel's treatment at Open Sky under Adjustment Code D2, stating: "…This claim was denied

because these services were not authorized in advance. Please refer to your Certificate of Coverage for more information. …"

24. A second Explanation of Benefits statement dated June 15, 2015, denied payment under Adjustment Code TNYL, it stated: "…This claim has been denied because the time frame for claim submission has expired. Please refer to your health benefit plan documentation with any questions. …"

25. On October 26, 2015, Jonathan submitted a level one appeal of the denial of Daniel's treatment at Open Sky.

26. Jonathan argued that residential treatment was a covered benefit under the terms of the Plan, and that Open Sky met the licensing requirements for residential treatment required by the Plan.

27. Jonathan stated that the Plan did not include a penalty for lack of precertification. He wrote that according to Section XX of the Plan, care should not have been denied in full or in part if preauthorization was not obtained. Instead, if care was not authorized in advance, Section XX instructs the reviewer to conduct a retrospective medical necessity review and to deny payment only if the claims administrator then determined that treatment was not medically necessary. Jonathan contended that OXP did not follow this process in its May 7, 2015, denial.

28. Jonathan stated that under the terms of the Plan, he had 120 days to submit a claim, or if submission within 120 days was not feasible, the Plan stipulated that claims should be submitted "as soon as reasonably possible" from the date services were received. Jonathan said that claims for Daniel's treatment ending April 7, 2015, were submitted on April 21, 2015, within the Plan's timely filing limit.

29. After Jonathan noticed that the submitted claim did not include dates of service for January 8, 2015, through January 14, 2015, he submitted a corrected claim on June 10,

2015. Jonathan argued that while this corrected claim now fell outside of the 120-day

timely filing window, it was submitted as soon as reasonably possible after the error was

discovered, as allowed by the Plan.

30. Jonathan wrote that since the Plan was issued in New York, it was subject to sections

3221 and 3420 of the New York Code, which impose a notice-prejudice rule upon the

Plan. This rule requires OXP to show that it suffered actual prejudice as a result of the

delay in filing. If no prejudice is shown, the claims cannot be denied for lack of timely

filing.

31. In a letter dated November 30, 2015, OXP upheld the denial of Daniel's treatment at

Open Sky. The letter listed only January 8, 2015, as the date of service being considered.

The reviewer gave the following justification for upholding the denial:

> …Based on our review, according to your Benefit Plan, under the section Claim
> Determinations, subsection Timeframe for Filing Claims, this request for payment
> was processed correctly:
>
> Claims for services must be submitted to Us for payment within 120 days after You
> receive the services for which payment is being requested. If it is not reasonably
> possible to submit a claim within the 120-day period, You must submit it as soon as
> reasonably possible,
>
> Because the claim(s) for this service(s) was processed according to the above plan
> provision(s), our original determination remains unchanged, and the determination is
> upheld. …

32. OXP sent Jonathan a second letter also dated November 30, 2015, this letter covered

dates of service January 15, 2015 to April 7, 2015. It stated in part:

> …The Oxford Health Insurance, Inc. Central Escalation Appeals Unit received
> your letter on October 31, 2015. We understand your request to state that. [sic] A
> letter was sent by our Central Escalation Appeals Unit, acknowledging receipt of
> your request on November 3, 2015.
>
> Upon further review of your request, we determined the questions and concerns
> expressed in your correspondence do not qualify as an appeal. As a result, your
> letter and any attached documents have been forwarded to the appropriate Oxford

Health Insurance, Inc. department for review. You will receive a response to your issues shortly. …

33. On March 16, 2016, OXP sent Jonathan a letter stating:

…We are writing in response to the issue you submitted to Oxford Health Insurance, Inc's appeals unit about requesting coverage for the claim denied for timely filing. This letter is to inform you that the appeal request has been withdrawn because a second level of appeal request has not been submitted. …

34. After what he termed "a bevy of administrative errors committed on the part of [United]", Jonathan submitted a complaint to the New York State Department of Financial Services ("NYSDFS") On June 16, 2016. Jonathan claimed that OXP had improperly denied Daniel's treatment at Open Sky.

35. NYSDFS advocated on Daniel's behalf, but OXP maintained the denial. NYSDFS sent Jonathan a copy of the denial correspondence that it had received from OXP dated April 11, 2017. The letter stated in part:

I am writing in response to your follow up regarding the above-referenced complaint, dated and received in our office on March 20, 2017. Upon review, I forwarded your follow up questions to OXP Behavioral Health (UBH) for review. Their response is as follows:

Question: You state this is a residential treatment facility under the laws of the state of Colorado. What does this mean. [sic]

Answer: The facility is licensed as a residential childcare facility by the state of Colorado. Per the member's Certificate of Coverage (COC), outside of New York the facility is covered if it is licensed or certified by a state agency.

Question: Are you advising us that although Colorado licensed this facility as a residential treatment, [sic] you would never pay for services because you consider it wilderness therapy?

Answer: Oxford/UBH's denial is based on the determination that the services being rendered are experimental/investigational. The facility is presenting the services as a wilderness program and not residential services. Per their http://openskywilderness.com/, the only accreditation listed is Outdoor Behavioral Healthcare.

Question: If it is recognized as a residential, [sic] and this member has coverage how are we denying it as investigational?

Answer: Optum's Clinical Technology Assessment Committee (CATC) determined that wilderness therapy is experimental/investigational and not medically necessary for the treatment of emotional, addiction, and/or psychological problems including, but not limited to adjustment disorders, mood disorders, anxiety disorders, conduct disorders, impulse disorders, social functioning disorders, substance related disorders, and attention-deficit hyperactivity disorders. There is inadequate evidence of the safety and efficacy of wilderness therapy for treating these conditions. Weak study designs, safety concerns, inadequately trained staff, and questions of long-term benefit are key limitations. Conclusions based on the evidence: The wilderness therapy literature contains a number of studies that suggest participants show some level of improvement on both behavioral health outcomes and recidivism rates for juvenile offenses. However, there are substantial limitations in the research methodology used to examine many of these programs. … Authors note that for wilderness therapy to become a more formal part of the mental health delivery system, the field will need to be willing to conform to the standards of other ancillary health care providers. Particularly, higher standards of staff training and credentialing will be necessary, along with a more robust evidence base (e.g.,Berman & Davis-Berman,2013). …

36. On October 4, 2017, Jonathan requested a second level-one member appeal of the denial of Daniel's treatment at Open Sky.

37. Jonathan stated that it was appropriate to draft a second level-one appeal because OXP had changed its rationale for denying care. OXP initially denied coverage on the basis that Daniel's treatment was not preauthorized. After OXP received Jonathan's appeal, it changed the reason for denial of care to wilderness treatment not being an authorized service. Jonathan argued that this change of rationale should afford him the ability to address the new denial in a second level one appeal.

38. Jonathan alleged that OXP was in violation of ERISA by not providing specific references to the documentation that it relied upon to deny care, and by not providing the names and qualifications of the individuals involved in the review process.

39. He wrote that while OXP claimed that wilderness therapy was not a covered service, it did not cite any specific language in the Plan that stated that wilderness therapy was not a covered benefit.

40. Jonathan wrote that OXP had cited a single 2013 article by Berman and Davis-Berman to back up its claim that wilderness therapy was an unproven and experimental treatment. Jonathan noted that the reviewer had copied the abstract of the study nearly word for word. Daniel claimed that the article itself had not been thoroughly reviewed or sourced.

41. Jonathan reviewed the study himself and found that the sentence the abstract was based on included an exception for wilderness programs in the OXP States like Open Sky. He cited a note from the actual body of the study which stated:

> *With the notable exception of the Outdoor Behavioral Healthcare Industry Cooperative (OBHIC) programs in the OXP States*, the vast majority of TA programs are at the level of Tier 1 or recreation, education, self-esteem, or adjunctive programs. If adventure and wilderness therapy programs want to be a viable treatment option to fill the gap between mental health need and service in adolescents worldwide, they will need to meet more of the criteria for higher levels of treatment along the continuum of care. (emphasis added)

Jonathan argued that the only study cited by OXP included an exemption for OBHIC accredited programs. Open Sky possesses this accreditation and belongs to this exempt group of wilderness programs.

42. Jonathan argued that there are numerous scientific studies showing the efficacy of wilderness programs. He cited a study performed by Dr. Michael Gass from the University of New Hampshire which showed that students that had been recommended wilderness treatment, but had opted out of the program did not progress as well as those who actually underwent the treatment. Jonathan included numerous other peer reviewed articles identifying the benefits of wilderness therapy with his appeal.

43. Jonathan stated the Plan was subject to the requirements of MHPAEA. He argued that since the Plan offered coverage for mental health benefits, MHPAEA mandated that such benefits must be offered "at parity" with any medical or surgical benefits offered by the Plan. Jonathan wrote that none of the comparable medical or surgical benefits offered by

the Plan had requirements as stringent as those applied to Daniel's mental health treatment.

44. On January 12, 2018, OXP sent Jonathan a letter upholding the denial of Daniel's treatment at Open Sky. The reviewer wrote:

> …Based on the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care and the Optum Clinical Technology Assessment Committee evaluation of Wilderness Therapy as experimental/unproven service, it is my determination that that [sic] no authorization can be provided from 01/08/2015 forward.
>
> You were admitted for treatment of problems with your mood, behavior, and addiction. After reviewing the available information, it is noted that your condition did not meet Guidelines for coverage of treatment in this setting. You were stable from a medical and mental health standpoint. You were not in withdrawal. You were not thinking about hurting yourself or others. You were not hearing or seeing things that others do not. You had the support of your family. You did not require 24-hour nursing care. In addition, you were in a wilderness therapy program. Wilderness therapy is considered experimental and unproven. It is not covered under your health plan. You could have continued care in the Mental Health Intensive Outpatient Program setting. …

**Crossroads**

45. On the advice of Daniel's treatment team at Open Sky, Daniel was admitted to Crossroads on April 8, 2015, immediately following his discharge from Open Sky.

46. In a letter dated April 15, 2015, OXP denied payment for Daniel's treatment at Crossroads. The reviewer gave the following justification for the denial:

> …You were admitted for treatment of Depression. It is reported that you made progress and no longer need the type of care and services provided in this setting. You are not a danger to self or others. You have no medical issues. You are active in treatment. Care could continue as an outpatient.
>
> Based on the Optum Level of Care Guidelines for Mental Health Residential Treatment Center, it is my determination that no further authorization can be provided from 04/15/2015 forward.
>
> This decision was based on clinical guidelines. The guidelines used for the decision are based on the following:
>
> American Association of Community Psychiatrists (2010) Level of Care Utilization System for Psychiatric and Addiction Services, Adult Version

American Academy of Child and Adolescent Psychiatry (2001) Child and Adolescent Service Intensity Instrument, Child and Adolescent Care and Utilization System, Version 1.5…

47. In a letter dated May 10, 2015, Tim Mullins MA, ACHMC, recommended that Daniel

continue treatment at Crossroads, he stated in part:

> …My recommendation and the recommendation of his educational consultant was that he continue for treatment for anxiety, substance use, and attachment issues in a transitional living environment. Without continued care, Daniel would likely relapse into substance use, worsening self-image, and debilitating anxiety…

48. In a letter dated June 28, 2015, Board Certified Psychiatrist Dr. Alexander Lerman wrote

in part:

> I treated Daniel [Z.] for a constellation of psychiatric and substance abuse problems, between 10/29/2013 and 3/19/2014. I terminated his care because I believed his problems were beyond my capacity to help him. Daniel urgently needed a therapeutic wilderness program, and his current sober living program. While prognostication in psychiatry is a notoriously difficult proposition, I believe I can state with near-certainty that Daniel had no prospect of recovery or sustained remission at a lower level of care. The treatment he has received since January 2015 is medically essential.

49. Jonathan submitted a level-one member appeal of the denial of Daniel's treatment at

Crossroads on September 29, 2015.

50. Jonathan argued that while Daniel had a dual diagnosis of both substance use and mental

health disorders, OXP denied payment for Daniel's treatment based solely on mental

health criteria. Jonathan requested that a medical director certified in both psychiatry and

substance abuse issues conduct the next review.

51. Jonathan argued that Daniel met the Plan's requirements for continued care at a

residential treatment center. He stated that care should not have been denied just because

Daniel was active in his treatment and was not a threat to himself or others. Jonathan

wrote that United's assertion that "You have no medical issues" was only accurate in the

sense that Daniel did not have any physical health problems; Daniel still suffered from a

variety of mental health conditions.

52. Jonathan wrote that the OXP reviewer had incorrectly utilized acute-care criteria to evaluate Daniel's sub-acute care at Crossroads.

53. Jonathan included a copy of Daniel's medical records with the appeal. These records showed that Daniel struggled to maintain sobriety even while attending Crossroads. Excerpts of the medical records included with the appeal are listed below:

- Note- 7/20/2015:

  …Client was confronted about an ETG that came back positive. Client opened up about buying lemon extract from the store, putting the entire bottle into lemonade, and drinking it. He stated, "I saw it online, wanted to try it, and I thought I could get away from the system." He discussed how he became ill quickly after drinking it, threw up, and then felt sick for the rest of the day. He reported, "It not even being worth it. I didn't feel anything and now I got caught." He discussed feeling frustrated because he is fearful he will not be able to go home.
  Assessment:
  Client reacted with child-like thinking. He was not concerned with the relapse but if the consequence would be that he cannot go home. He was not able to process and was irrational in his thought content. …

- Note- 9/15/2015:

  …Client opened up about his drug history. He discussed how the "Just Chill" oil mimicked his same behaviors, thought processes, and actions. He stated, "If I had some, I was hiding out and not letting anyone take a hit." If someone else had it, I was pretending to be their friend and would lurk by them." He reported that since stopping he has been craving and stated, "I had to confide in another student and have them help me to stay accountable. If I want to go purchase some I tell him I am craving and wanting it." He discussed how he justified in his head and rationalized why it was okay. He discussed how in the past he would hide liquor bottles in vents and stated, "I did some things I regret."

54. Jonathan wrote that OXP had violated its legal responsibilities by using its own internal treatment guidelines to evaluate care, instead of either those set forth by the Plan, or those consistent with generally accepted medical practice set forth by the American Academy of Child and Adolescent Psychiatry. Jonathan pointed out that OXP was currently the Defendant in two class action lawsuits involving the misapplication of its Level of Care Guidelines.

55. Jonathan argued that residential treatment was the lowest level of care at which Daniel could have been successfully treated and was the course of treatment recommended by the medical professionals that had treated Daniel in person. Jonathan concluded by arguing that, as with Open Sky, OXP continued to directly violate ERISA and MHPAEA in the manner that it had evaluated the claims and denied payment for Daniel's treatment at Crossroads.

56. On October 21, 2015, OXP sent Jonathan a letter maintaining the denial of Daniel's treatment at Crossroads. The reviewer gave the following justification for the denial:

…The decision is to upheld the denied Mental Health Residential Treatment Care benefits from 04/15/2015 forward. The reason for this decision is based on lack of medical necessity per Optum Level of Care Guidelines for Mental Health Residential Treatment Care Level of Care. The member was admitted for treatment of anxiety concerns. After reviewing the facility medical records, it was noted the member had made progress and the member's condition did not meet Guidelines for further coverage of treatment in this setting. The member had worked on his recovery by attending therapy sessions. The member did not have medical or mental health concerns needing 24-hour care. The member was not acting on every feeling. The member was thinking clearly. The member was doing your daily tasks. [sic] At least weekly psychiatric consultations are not occurring. The care could continue in the Mental Health Outpatient setting. …

57. Daniel was discharged from Crossroads on December 23, 2015.

58. On February 15, 2016, Jonathan requested an external review of the denial of Daniel's treatment at Crossroads.

59. Jonathan reiterated the arguments that he had raised in his level one appeal, including the fact that Daniel's Dual Diagnoses, United's ERISA violations, and United's MHPAEA violations were not addressed in the previous denial letter.

60. Jonathan wrote that Daniel was not able to maintain sobriety in the outpatient setting, and that outside of the supportive environment of a residential treatment center, Daniel had been engaging in increasingly risky and dangerous behavior. He argued that Daniel's substance use had escalated over time despite numerous attempts at treatment by a variety of medical professionals at a lower level of care.

61. Jonathan argued that the fact that Daniel was improving showed that the treatment was effective, and improvement should not have been used by OXP as a reason to deny coverage. Jonathan wrote that statements such as, "The member was not acting on every feeling. The member was thinking clearly. The member was doing your daily tasks," did not make sense, as they were not based on any clinical criteria or the terms of the Plan.

62. Jonathan disputed United's argument that "weekly psychiatric consultations are not occurring." He argued that Crossroads was licensed by the State of Utah as a residential treatment center, and that as long as Crossroads was acting within the scope of its licensure, OXP could not impose additional guidelines on the facility that superseded those required by the state for residential treatment.

63. Jonathan wrote that the average length of stay in a residential treatment facility is seven to twelve months, and Daniel's treatment was well within the norm. Jonathan included an updated copy of Daniel's medical records with the appeal. These records documented that while Daniel was making progress, he still suffered from drug cravings and mental health concerns.

64. A Therapy Note from Crossroads dated October 20, 2015 stated in part:

…Assessment: Client was in a state of irrational thinking, paranoia, catastrophic type thinking, and speech was fast and hard to track. Impulsivity and thoughts of substance use was present. When his anxiety gets to this level, it is hard for him to hear and calm down. …

65. On February 26, 2016, 11 days after Jonathan had requested an external review, OXP sent Jonathan a corrected version of the October 21, 2015, letter. The corrected letter included a new field which read "Provider Name: Attending Physician". It also included a notification that this was the final adverse determination of the appeal and was

considered by New York State law to be a determination of medical necessity. This information was absent from the initial denial letter.

66. In a letter dated March 24, 2016, the external review agency upheld the decision to deny care. The reviewer wrote in part:

> …This reviewer agrees with the decision to deny continued mental health residential treatment at Crossroads from 4/15/15 forward as the chart notes do not provide enough specific evidence to support that he could only be treated in a 24 hour residential treatment or could not be treated in a less restrictive level of care as of then.
>
> The American Psychiatric Association Practice Guidelines for the Treatment of Patients with Major Depressive Disorders and the American Psychiatric Practice Guidelines for the Treatment of Patients with Substance Use Disorders reports that the least restrictive level of care for safe and effective treatment is appropriate. It also states that patients with suicidal intent, plan, or behaviors are candidates for inpatient treatment.
>
> In this case this patient had past reported significant depression and suicidal thinking as well as past physical aggression and property destruction but not as of 4/15/15 and forward. The patient was in a 24 hour wilderness program for 3 months prior to this admission. In that program it was reported that he started to develop skills to regulate anxiety and he finally had acceptance into exploring negative consequences related to alcohol and substance use and developed sincere interest in recovery. It was recommended that he continue to develop skills to support his commitment to sobriety and to develop healthy stress management and emotional regulation skills. This did not require 24 hour treatment. He reportedly made enough progress to be stepped down to a less restrictive level of care then. He did not have physical aggression, property destruction, out of control behavior, suicidal thinking or behavior as he had in the past and he had reportedly made enough progress while in the wilderness program to be stepped down to a less restrictive level of care then. Chart notes at this facility reported that he had appropriate mood, no suicidal/homicidal ideation, had no danger risk, appropriate thought process and content, and had focused concentration. Even notes 7/15/15, 8/17/15, 9/15/15, 11/3/15, and 12/8/15 reported this. The chart notes did not provide specific identifiable and quantifiable treatment goals or objectives that could only be achieved in a 24 hour residential treatment or that could not be achieved in a less restrictive setting as of then. As a result, uphold the previous decision and deny continued mental health residential treatment at Crossroads from 4/15/15 forward. …

**Aim House**

67. After Daniel completed his treatment at Crossroads, he continued using drugs without his parents' knowledge. After an incident in which Daniel was hospitalized, his parents

discovered that Daniel's rehabilitation had not been successful. Daniel's therapist Jayne Eliach recommended that Daniel begin treatment at Aim House. Daniel was admitted to Aim House on January 11, 2017.

68. OXP pre-authorized Daniel's treatment at Aim House, but subsequently denied payment due to a lack of pre-authorization.

69. Jonathan received two Explanation of Benefits, each with the following statement as to why payment was denied:

> …Your Provider is required to let us know before you have this service to obtain authorization. If the physician or health care provider doesn't receive authorization before you receive the service, the benefit for the service is denied. If you used a network provider no amount is due.
> If this service was performed by an out-of-network provider without your knowledge this could be a surprise bill. Please see below information about surprise bills. …

70. In addition, Jonathan received a letter dated January 18, 2017, which gave a different justification for denying payment. Jonathan received this letter by fax several months after it had allegedly been written. The letter was addressed to Aim House and stated in part:

> …I have reviewed the request for your treatment plan that was submitted by Aim House, and I have determined that coverage is not available under your benefit plan for the requested services of transitional living.
>
> As described in the exclusion section of your Certificate of Coverage for New York City Specialized Dentistry; Transitional living which is a domiciliary service is not a covered benefit. Residential mental health service is a covered benefit; however transitional living which [sic] is not a residential treatment service and is not covered. …

71. Daniel was discharged from Aim house on July 21, 2017.

72. On December 4, 2017, Jonathan composed a level-one member appeal of the denial of Daniel's treatment at Aim House. Jonathan also sent a copy of the appeal to the New York Department of Insurance to file a formal complaint against United.

73. Jonathan argued that contrary to the statements in the Explanation of Benefits, Daniel's treatment at Aim House had been pre-approved by United. Jonathan requested that OXP provide him with a formal denial letter stating that preauthorization had not been obtained, but he never received one.

74. Daniel called OXP representatives multiple times in an effort to resolve United's erroneous denial of payment due to lack of preauthorization, and to request an official denial letter. Over a period of several months, Daniel spoke to more than 10 different OXP representatives and was given multiple conflicting accounts for why the care was not authorized. One of the representatives, Marcie [in call reference number 21453302] confirmed that care had been preauthorized. She stated that a denial had been sent to Aim House, but not to Jonathan. Jonathan contended that informing the facility that care was denied, but not informing him was a violation of ERISA.

75. Jonathan claimed that although the denial letter he eventually received was dated January 18, 2017, he was not provided with that letter until several months after that date, and he only received it after multiple requests for an official denial letter. In fact, Jonathan wrote that he spoke to several customer service representatives who claimed that no such letter existed —including Marcie in the call referenced in ¶74— Marcie had stated that as of June 22, 2017, no denial letter had actually been written, even though the denial Jonathan eventually received was dated January 17, 2017. Marcie stated that instead of writing a letter, denial had been given verbally to Aim House.

76. Based on Jonathan's repeatedly ignored requests for a formal denial letter, and based on his conversations with multiple OXP representatives who stated that no official denial letter existed, Jonathan questioned whether the letter dated January 17, 2017, had been written at a later date, and then backdated to give it the appearance of having been written in January.

77. Jonathan stated that the other denial rationale listed in the January 18, 2017, letter relied on an exclusion that was not present in the terms of the Plan. He argued that in addition to treatment being a covered benefit according to the provisions of the Plan, MHPAEA compelled OXP to offer coverage for Daniel's treatment at Aim House.

78. On December 22, 2017, OXP sent Jonathan a letter in response to his level one appeal. The letter upheld the decision to deny care at Aim House. The reviewer gave the following justification for the denial:

> …The transitional living program is not covered by your insurance plan. This is not to say that you cannot seek treatment that is covered by your plan. Your plan coverage includes inpatient and outpatient care. You can call the number on your insurance card for more information about your benefit coverage and to get referrals for providers covered by your plan. …

79. Jonathan exhausted his appeal obligations under the terms of the Plan.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

80. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

81. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

82.  OXP and the Plan breached their fiduciary duties to Jonathan and Daniel when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in Daniel's interest and for the exclusive purpose of providing benefits to ERISA

participants and beneficiaries and to provide a full and fair review of Daniel's claims.

83. The actions of OXP and the Plan in failing to provide coverage for Daniel's medically necessary treatment at Open Sky, Crossroads and Aim House are violations of the terms of the Plan and United's medical necessity criteria.

84. OXP acted in an arbitrary and capricious manner by failing to provide a consistent justification for why it had denied Daniel's medically necessary treatment.

**SECOND CAUSE OF ACTION**

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

85. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

86. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

87. Specifically, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

88. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

89. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for Daniel's treatment include sub-acute inpatient treatment

19

settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does OXP exclude coverage for medically necessary care of medical/surgical conditions based on geographic location, facility type, provider specialty, or other criteria in the manner OXP excluded coverage of treatment for Daniel at Open Sky, Crossroads, and Aim House.

90. Specifically, the actions of OXP and the Plan requiring that Daniel satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

91. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the criteria utilized by the Plan and OXP, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

92. OXP's imposition of requirements for coverage of the sub-acute inpatient treatment provided to Daniel that are more stringent than those required to obtain coverage for sub-acute inpatient treatment for medical and surgical disorders is a violation of MHPAEA.

93. The actions of OXP and the Plan, as outlined above, have caused damage to Jonathan and Daniel in the form of denial of payment for medical services provided to Daniel at Open Sky from January 8, 2015, through April 4, 2015, in an amount exceeding $40,000, services provided at Crossroads from April 8, 2015, through December 23, 2015, in an amount exceeding $38,000, and services provided at Aim House from January 11, 2017 through July 21, 2017, in an amount exceeding $53,000.

94. In total, Jonathan paid out of pocket more than $128,000 for Daniel's wrongfully denied treatment.

95. The violations of MHPAEA by OXP and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendant violate MHPAEA;

(b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan and OXP insured plans as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendant from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiffs for their loss arising out of the Defendant's violation of MHPAEA.

96. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1.      Judgment in the total amount that is owed for Daniel's medically necessary treatment under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.      Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.      For such further relief as the Court deems just and proper.

DATED this 17th day of May, 2019.

By _____s/ Brian S. King_____
        Brian S. King
        Attorney for Plaintiffs