IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JOHNATHAN Z., and DANIEL Z., <br><br> Plaintiffs, <br><br> v. <br><br> OXFORD HEALTH PLANS, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS** <br><br> Case No. 2:18-cv-383-JNP-PMW <br><br> District Judge Jill N. Parrish |

Defendant Oxford Health Plans ("Oxford") moves to dismiss the Second Amended Complaint ("SAC") filed by plaintiffs Johnathan Z. and Daniel Z. (collectively, "Plaintiffs") for failure to state a claim. Plaintiffs allege healthcare insurance coverage violations of the Employee Retirement Income Security Act of 1974 ("ERISA") and the Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act"), an amendment to ERISA. Having considered the parties' briefs and argument advanced at a hearing on January 15, 2020, the court denies the Defendant's Motion to Dismiss (the "Motion").

## I.    BACKGROUND

Plaintiff Johnathan Z. maintained a healthcare insurance policy through a self-funded employee welfare benefits plan entitled the New York City Specialized Dentistry Benefits Plan (the "Plan"). SAC ¶ 2. Oxford is the insurer and claims administrator for the Plan. *Id.* ¶ 3. The Plan covered Johnathan Z. as the Plan participant and Daniel Z. as his minor son and eligible beneficiary. *Id.* ¶¶ 1, 3.

Daniel Z. has long struggled with mental health and substance use disorders. He began abusing illegal drugs when he was twelve years old. *Id.* ¶ 12. When he was fourteen years old, he

began using painkillers and dealing drugs at school, which resulted in his expulsion. *Id.* Daniel Z. has also been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), Anxiety Disorder, and Depression. *Id.* ¶¶ 14, 16. He has twice been admitted to the hospital to treat his substance abuse and mental health issues, including after an incident in November 2012 when he "became very angry and threatened to kill himself with a kitchen knife." *Id.* ¶¶ 13, 16. He also was arrested in November 2014 for possessing Methylenedioxymethamphetamine ("Molly"), an illegal controlled substance. *Id.* ¶ 18. Plaintiffs sought outpatient psychiatric care for Daniel Z.'s mental health and substance use disorders, but none proved effective at treating his condition. *See id.* ¶¶ 17–18.

On the advice of Daniel Z.'s mental health care providers, Plaintiffs have enrolled him in a variety of residential mental health and substance abuse treatment programs. *See, e.g.*, *id.* ¶¶ 20, 21, 47, 48, 67. First, Daniel Z. participated in a wilderness behavioral therapy program at Open Sky Wilderness Therapy ("Open Sky") from January 8, 2015, to April 7, 2015. *Id.* ¶¶ 20, 22. Open Sky operates in Utah and Colorado, and is "a licensed and accredited outdoor behavioral health program that offers mental health services to adolescents between the ages of 13–18." *Id.* ¶ 4. Plaintiffs allege that "Open Sky met the licensing requirements for residential treatment required by the Plan." *Id.* ¶ 26. Next, Plaintiffs admitted Daniel Z. to Crossroads Academy ("Crossroads"), which is "a licensed residential treatment center in Utah that specializes in treating adolescent boys with a dual diagnosis of substance use and mental health disorders." *Id.* ¶ 5. He remained in treatment at Crossroads from April 8, 2015, to December 23, 2015. *Id.* ¶¶ 45, 57. Finally, Plaintiffs sought care for Daniel Z. at Aim House from January 11, 2017, through July 21, 2017. *Id.* ¶¶ 67, 71. Plaintiffs describe Aim House as "a young adult treatment facility in Colorado that provides a

structured environment designed to help ease the transition from residential treatment and wilderness programs to independent living." *Id.* ¶ 6.

### A. OXFORD'S INSURANCE COVERAGE OF DANIEL Z.'S TREATMENT

Plaintiffs filed insurance claims with Oxford for coverage of Daniel Z.'s treatment at Open Sky, Crossroads, and Aim House. Oxford denied benefits for all of Daniel Z.'s residential care at Open Sky and Aim House, and covered one week of his treatment at Crossroads. Plaintiffs exhausted internal and external appeals of Oxford's coverage denials, all of which were rejected. *See id.* ¶ 79. Plaintiffs allege that Oxford's denial of benefits for Daniel Z.'s treatment at Open Sky, Crossroads, and Aim House caused Plaintiffs to incur over $128,000 in medical expenses. *See id.* ¶ 94.

#### 1. Denial of Coverage for Open Sky Treatment

Plaintiffs enrolled Daniel Z. in the Open Sky wilderness therapy program from January 8, 2015, to April 7, 2015. *Id.* ¶¶ 20, 22. In two Explanation of Benefits statements dated May 7, 2015, and June 15, 2015, Oxford initially denied Plaintiffs' claim for benefits for treatment at Open Sky because Plaintiffs' lacked preauthorization for treatment and their claims for benefits were untimely. *See id.* ¶¶ 23–24. In a subsequent letter dated April 11, 2017, Oxford also stated that its denial of benefits for Open Sky was "based on the determination that the services being rendered are experimental/investigational." *Id.* ¶ 35.

On October 4, 2017, Plaintiffs appealed Oxford's adverse benefits determination and alleged that Oxford "was in violation of ERISA by not providing specific references to the documentation that it relied upon to deny care, . . . by not providing the names and qualifications of the individuals involved in the review process," by failing to "cite any specific language in the Plan that stated that wilderness therapy was not a covered benefit," and by relying on and misconstruing a single academic study to make its determination. *Id.* ¶¶ 38–42. Plaintiffs also

stated that Oxford violated the Parity Act in denying Daniel Z. benefits because it had applied more stringent requirements on mental health/substance abuse treatment than it would have applied if Plaintiffs sought analogous medical/surgical care. *Id.* ¶ 43.

On January 12, 2018, Oxford sent Plaintiffs a letter upholding its denial of benefits for Daniel Z.'s care at Open Sky. *Id.* ¶ 44. The reviewer wrote that the Open Sky treatment was not eligible for benefits because it was an "experimental/unproven service" and the treatment was not medically necessary based on Oxford's criteria because Daniel Z. was "not in withdrawal," was "not thinking about hurting [him]self or others," was "not hearing or seeing things that others do not," and overall "did not require 24-hour nursing care." *Id*.

### 2. Denial of Coverage for Crossroads Treatment

On advice of Daniel Z.'s mental health care providers at Open Sky, Plaintiffs admitted him to Crossroads immediately upon discharge on April 8, 2015. *Id.* ¶ 45. In a letter dated April 15, 2015, Oxford denied benefits for Daniel Z.'s treatment at Crossroads from that day forward. *Id.* ¶ 46. Specifically, Oxford claims reviewers found that Daniel Z.'s treatment at Crossroads was not medically necessary based on its criteria because Oxford determined that Daniel Z. was "not a danger to self or others," had "no medical issues," was "active in treatment," and "could continue [care] as an outpatient." *Id*.

Plaintiffs submitted their "level one" appeal of Oxford's denial of benefits concerning Crossroads on September 29, 2015. *Id.* ¶ 49. Plaintiffs argued that Oxford's denial of benefits was improper because it ignored his "dual diagnosis of both substance use and mental health disorders," was not accurate based on Daniel Z.'s medical records, and the Oxford claim reviewers "had incorrectly utilized acute-care criteria to evaluate Daniel's sub-acute care at Crossroads." *Id.* ¶¶ 50–52. In support of their appeal, Plaintiffs submitted letters from two mental health care professionals who recommended that Daniel Z. undergo residential treatment for his condition, *see*

*id.* ¶¶ 47–48, as well as updated medical records showing recent evidence of Daniel Z.'s severe condition, *see id.* ¶ 53. Plaintiffs also asserted that Oxford violated ERISA and the Parity Act because it used undisclosed internal criteria to evaluate the medical necessity of Daniel Z.'s Crossroad treatment that were not in conformance with the terms of the Plan or generally accepted medical practice. *Id.* ¶¶ 54–55.

Oxford upheld its denial of benefits for Crossroads in a letter dated October 21, 2015. *Id.* ¶ 56. Oxford again relied on its internal criteria and determined that Daniel Z.'s care at Crossroads was not medically necessary. *Id.* Daniel Z. completed his program at Crossroads on December 23, 2015. *Id.* ¶ 57. Approximately two months later on February 15, 2016, Plaintiffs requested an external review of Oxford's denial of benefits for Crossroads, reiterating many of the arguments they made in their internal appeals and emphasizing that lower levels of care had been tried on multiple occasions but were ineffective to address Daniel Z.'s substance abuse and "increasingly risky and dangerous behavior." *Id.* ¶¶ 58–63. In support, Plaintiffs attached an October 20, 2015 Therapy Note from Crossroads that stated Daniel Z. "was in a state of irrational thinking, paranoia, catastrophic type thinking." *Id.* ¶ 64. The external reviewer upheld the decision to deny benefits based on the lack of medical necessity on March 24, 2016, stating that Daniel Z. no longer had "significant depression and suicidal thinking" or urges to act on "physical aggression and property destruction." *Id.* ¶ 65. The external review letter further stated that Daniel Z.'s charts from Crossroads showed that he "had appropriate mood, no suicidal/homicidal ideation, had no danger risk, appropriate thought process and content, and had focused concentration." *Id.*

### 3. Denial of Coverage for Aim House Treatment

After Daniel Z. completed his treatment programs at Open Sky and Crossroads, he secretly continued his severe drug use and his parents only discovered a relapse after he had to again be hospitalized. *Id.* ¶ 67. Daniel Z.'s therapist then recommended that he begin treatment at Aim

House, and he enrolled in the program from January 11, 2017, to July 21, 2017. *Id.* ¶¶ 67, 71. Plaintiffs allege that Oxford initially preauthorized Daniel Z.'s treatment at Aim House, but then subsequently denied payment due to a lack of preauthorization. *Id.* ¶¶ 68–69. In addition, Oxford explained in a letter dated January 18, 2017 (which Plaintiffs allege they did not receive until several months later), that it denied benefits for Aim House because Aim House provides "[t]ransitional living which is a domiciliary service [that] is not a covered benefit." *Id.* ¶ 70.

Plaintiffs submitted a level one appeal concerning Aim House on December 4, 2017, and sent a copy of the appeal to the New York Department of Insurance to file a complaint against Oxford. *Id.* ¶ 72. Plaintiffs argued that Oxford had preapproved the Aim House treatment and that Oxford representatives had confirmed the preapproval in multiple phone calls. *Id.* ¶ 74. Plaintiffs also contended that the exclusion of treatment at a transitional living center such as Aim House was not listed in the terms of the plan, and such an exclusion would violate the Parity Act. *Id.* ¶ 77. On December 22, 2017, Oxford upheld the denial of benefits for treatment at Aim House and reiterated that the Plan "covers inpatient and outpatient care" but "transitional living program is not covered by [the Plaintiffs'] insurance plan." *Id.* ¶ 78.

### B. PLAINTIFFS' CLAIMS

Plaintiffs allege that Defendant's claims adjudication processes and decision to deny benefits for Daniel Z.'s treatment at Open Sky, Crossroads, and Aim House violated ERISA in two ways. In their First Cause of Action, Plaintiffs allege that Defendant wrongfully denied benefits for all of Daniel Z.'s treatment at Open Sky and Aim House, and all but one week of his care at Crossroads. Under this claim, Plaintiffs argue that Defendant improperly applied the terms of the Plan, violated its fiduciary duty under 29 U.S.C. § 1104(a)(1) to "act solely in [Daniel Z.'s] interest," did not meet its obligation under 29 U.S.C. § 1133(2) to provide a "full and fair review" of Plaintiffs' claims, and acted "in an arbitrary and capricious manner by failing to provide a

consistent justification for why it had denied [Daniel Z.'s] medically necessary treatment." *Id.* ¶¶ 80–84. Stated differently, Plaintiffs complain that Oxford failed to meaningfully or coherently engage during the appeals process, did not act in Daniel Z.'s interest, and failed to cover medically necessary treatment based on the terms of the Plan. Plaintiffs seek to recover benefits due under 29 U.S.C. § 1132(a)(1)(B).

In their Second Cause of Action, Plaintiffs allege that Defendant violated the Parity Act, a component of ERISA. Plaintiffs allege that Defendant violated the Parity Act by imposing more restrictive or additional treatment limitations on mental health/substance use disorder benefits than the limitations Defendant applies to analogous medical/surgical benefits. *Id.* ¶ 70. Specifically, Plaintiffs assert that Defendant committed "facial" violations of the Parity Act because the Plan's categorical exclusion of wilderness therapy and transitional living centers imposes separate or more restrictive treatment limitations on mental health/substance abuse services as compared to medical/surgical services. Plaintiffs also contend that Defendant committed "as-applied" Parity Act violations because it applied its medical necessity criteria and experimental/investigational care exclusion policy on mental health/substance abuse care more stringently that it would apply the same facially neutral limitations to analogous medical/surgical care. To rectify the alleged Parity Act violations, Plaintiffs seek equitable relief under 29 U.S.C. § 1132(a)(3) in the form of judicial declaration, injunction, reformation, disgorgement, accounting, surcharge, restitution, and equitable estoppel.

### C. PROCEDURAL HISTORY

Plaintiffs filed their initial Complaint in this dispute on May 11, 2018, alleging only the ERISA wrongful denial of benefits claim under 29 U.S.C. §1132(a)(1)(B). ECF No. 2. Plaintiffs amended their complaint on July 12, 2018, to add their Second Cause of Action concerning violations of the Parity Act as enforced through 29 U.S.C. §1132(a)(3). ECF No. 4. Defendant filed

its first Motion to Dismiss the Plaintiffs' Amended Complaint on October 24, 2018. ECF No. 20.

The first Motion to Dismiss became fully briefed on January 8, 2019. ECF No. 41. On April 10,

2019, the court issued an Order permitting Plaintiffs leave to file an amended complaint. ECF No.

44. Plaintiffs filed their SAC on May 17, 2019. ECF No. 50. Defendant filed this Motion on June

7, 2019, *see* ECF No. 54, and it became fully briefed on August 7, 2019. ECF No. 59.

## II.     LEGAL STANDARD

Defendant moves to dismiss Plaintiffs' SAC under FED. R. CIV. P. 12(b)(6) for failure to

state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The burden is

on the plaintiff to frame a complaint with enough factual matter (taken as true) to suggest that he

or she is entitled to relief." *Robbins v. Oklahoma ex rel. Dept. of Human Servs.*, 519 F.3d 1242,

1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). The allegations in the complaint must

be "more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of

action[.]'" *Id.* (quoting *Twombly*, 550 U.S. at 555). In addition, "once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint." *Twombly*, 550 U.S. at 563. In other words, once a plaintiff adequately states a claim

for relief, he or she "must nudge his [or her] claims across the line from conceivable to plausible

in order to survive a motion to dismiss." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir.

2012) (alteration and internal quotation marks omitted).

In considering a motion to dismiss, a district court not only considers the complaint, "but

also the attached exhibits," *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration

Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011), and the "documents incorporated into the

complaint by reference, and matters of which a court may take judicial notice," *Tellabs, Inc. v.*

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court "may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).[1]

## III.    ANALYSIS

Defendant advances three principal arguments in seeking to dismiss all or part of Plaintiffs' SAC. First, Defendant contends that Johnathan Z. lacks statutory and constitutional standing to bring his individual claims. Second, Defendant urges the court to dismiss Plaintiffs' SAC with prejudice (or in the alternative, to enter a stay) because Defendant asserts that Daniel Z. is a member of a pending class action that Defendant believes is premised on the same grounds as this lawsuit. Third, Defendant argues that Plaintiffs' Second Cause of Action alleging violations of the Parity Act is inadequately pled and should be dismissed with prejudice. For the following reasons, the court rejects all of Defendant's arguments and denies its Motion to Dismiss.

### A. STANDING

The court first addresses Johnathan Z.'s statutory and constitutional standing to sue under ERISA. Concerning statutory standing, only a "participant or beneficiary" of the Plan may bring a civil action "to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1). ERISA defines "participant" as:

> [A]ny employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

---

[1] Here, Plaintiffs' allegations are based in part upon the terms of the Plan. Defendant attached two "Group Plan and Certifications of Coverage" documents to its Motion concerning the relevant time periods, *see* ECF No. 54–1 at 1–2, and Plaintiffs do not contest the authenticity of those documents. Therefore, the court considers the Defendant's attachments in evaluating this Motion.

29 U.S.C. § 1002(7). Plaintiffs allege that Johnathan Z. was the plan participant during all relevant times. SAC ¶ 3. As a plan participant, Johnathan Z. "has standing to bring a civil action to enforce his rights under the terms of an ERISA plan or to enforce ERISA's provisions." *Alexander v. Anheuser-Busch Companies, Inc.*, 990 F.2d 536, 538 (10th Cir. 1993) (citation omitted). Moreover, Johnathan Z. must only have "a colorable claim for vested benefits," *Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1161–62 (10th Cir. 2004) (citation omitted), and "the requirements for a colorable claim are not stringent; [Plaintiffs] need have only a nonfrivolous claim for the benefit in question," *Horn v. Cendant Operations, Inc.*, 69 F. App'x 421, 426 (10th Cir. 2003) (citation omitted). Here, Johnathan Z.'s First Cause of Action seeks to enforce his rights to recover benefits under his ERISA plan, and his Second Cause of Action seeks to enforce the Parity Act, another substantive provision of ERISA. Therefore, Johnathan Z. has statutory standing.[2]

---

[2] The court rejects Defendant's proposed statutory standing requirements as overly stringent and inconsistent with the text and purpose of ERISA. First, ERISA permits plan participants to sue to enforce his or her rights "*or to clarify his rights* to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1). Although Plaintiffs in this case have not argued that this provision provides an independent basis for a parent plan participant's statutory standing, the court observes that nothing in ERISA restricts future plaintiffs from making such an argument. Second, Johnathan Z. had legal obligations to pay for his minor son's care during the time Plaintiffs sought benefits for Daniel Z.'s treatment. The fact that Daniel Z. has now become emancipated does not change the nature of his and Johnathan Z.'s legal relationship during the time Plaintiffs submitted their claims for benefits. *See K.K. v. United Behavioral Health*, No. 2:17-CV-01328-DAK, 2020 WL 262980, at *6 (D. Utah Jan. 17, 2020) (unpublished) (collecting cases and finding that a plan participant father "has standing to enforce his rights under the terms of the plan, which includes enforcing his right to obtain coverage for his minor child's medical bills." (citations, quotations, and alterations omitted)). Third, the court observes that accepting Defendant's rigorous standing requirement would put Plaintiffs in the untenable position where Daniel Z., as the beneficiary seeking benefits, and Johnathan Z., as the plan participant who paid for the treatment services, would have either statutory or constitutional standing, but not both. In other words, Daniel Z. would have statutory standing to sue as the beneficiary who is "enforc[ing] his rights under the terms of the plan," 29 U.S.C. § 1132(a)(1), but may lack a cognizable injury-in-fact for constitutional standing because he did not pay for the treatment. The opposite would be true for Johnathan Z., who suffered an injury-in-fact by footing the bill, but would not have statutory standing because he sought benefits for his minor son's treatment. Under Defendant's logic, then, neither party would have standing to

Johnathan Z. also has constitutional standing. Constitutional standing has three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized" and "actual or imminent." Second, a causal connection must exist between the injury and the conduct complained of; the injury must be fairly traceable to the challenged action. Third, it must be likely that the injury will be redressed by a favorable decision.

*Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447 (10th Cir. 1996) (citations omitted).

Plaintiffs allege that Johnathan Z. incurred over $128,000 in medical expenses for Daniel Z.'s care at Crossroads, Open Sky, and Aim House because of Defendant's alleged wrongful denial of benefits. *See* SAC ¶ 94. "This allegation satisfies the first two elements of constitutional standing—that Plaintiffs were injured and that Defendants caused the injury." *Kurt W. v. United Healthcare Ins. Co.*, No. 2:19-CV-223, 2019 WL 6790823, at *3 (D. Utah Dec. 12, 2019). Next, if Plaintiffs prevail on their First or Second Causes of Action, they may be entitled to recover benefits due or other equitable relief that would likely redress this identified injury-in-fact. *See id.* Therefore, Johnathan Z. has established both his statutory and constitutional standing to sue.

## B. EFFECT OF THE *WIT* CLASS ACTION

Defendant's Motion urges the court to compare Plaintiffs' SAC to the facts and claims in a consolidated ERISA class action brought in the Northern District of California. *See Wit v. United Behavioral Health*, 317 F.R.D. 106, 141 (N.D. Cal. 2016). Defendant argues that because of the proceedings in *Wit*, "Plaintiffs' SAC should be dismissed in its entirety and with prejudice" or in the alternative, should be stayed. ECF No. 54 at 2, 14.

---

sue. ERISA does not countenance such a demanding standard. *See Felix*, 387 F.3d at 1161–62 (requiring only "a colorable claim for vested benefits" (citation omitted)).

The *Wit* court certified three classes on September 19, 2016, which occurred while Plaintiffs were engaged in administrative appeals with Oxford and approximately one-and-a-half years before Plaintiffs filed this lawsuit. The relevant *Wit* class is defined as:

> Any member of a health benefit plan governed by ERISA whose request for coverage of residential treatment services for a mental illness or substance use disorder was denied by [United Behavioral Health ("UBH")], in whole or in part, between May 22, 2011 and June 1, 2017, based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines.

*Wit v. United Behavioral Health*, No. 14-CV-02346-JCS, 2019 WL 1033730, at *4 (N.D. Cal. Mar. 5, 2019). The presiding magistrate judge in *Wit* completed a ten-day bench trial on November 1, 2017. On March 5, 2019, the *Wit* court entered findings of fact and conclusions of law, holding that the defendant claims administrator was liable to the class under ERISA because of its breach of fiduciary duty and its arbitrary and capricious denial of insurance benefits. *See id.* at *51–55.

Plaintiffs allege they are not members of the *Wit* class. Plaintiff Johnathan Z. declares he has "kept careful track of mailed communications about coverage for [Daniel Z.'s] treatment since the time he was treated" and he "did not receive any notice of a potential class action claim arising against Oxford relating to Daniel's treatment at Open Sky, Crossroads, Aim House, or any other facility in the Summer of 2017." ECF No. 33–1 ¶¶ 5–6. Moreover, Plaintiffs state that they have no desire to participate in the class action and have remained committed to pursuing their claims on an individual basis. *See id.* ¶¶ 9–10.

Defendant argues that the court should dismiss or stay the Plaintiffs' case because the *Wit* lawsuit against the claims administrator, United Behavioral Health ("UBH"), has potential preclusive effects on this lawsuit and the court should abstain in this case under the "first-to-file" doctrine. Defendant asserts that Plaintiffs' ERISA claims are purportedly "premised on the same grounds" as the claims presented in the pending *Wit* class action and contends that "it is well-

established that members of a certified plaintiff class in a class action lawsuit are not entitled to bring separate individual actions." ECF No. 54 at 2. Plaintiffs respond that *Wit* has no preclusive effect on their case because the claims involve different defendants, as well as distinct claims and theories of liability under ERISA. ECF No. 56 at 4–5. Moreover, Plaintiffs argue they should not be held to the *Wit* class action proceedings because they did not receive notice of their putative membership in the class and therefore had no opportunity to opt out. *Id.* at 6–7. The court concludes that, at this time, *Wit* does not justify entering a stay or dismissing Plaintiffs' claims because *Wit* is an ongoing dispute with no formal preclusive effects and the circumstances do not merit abstention under the first-to-file doctrine.

### 1. Preclusive Effects of *Wit v. United Behavioral Health*

First, the court recognizes that under basic *res judicata* principles, "a judgment in a properly entertained class action is binding on class members in any subsequent litigation." *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984). But applying *res judicata* in a subsequent action requires "a valid, final judgment on the merits" concerning the overlapping matter that was actually litigated in the prior class action. *Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011); *see also Allen v. McCurry*, 449 U.S. 90, 94 (1980) (recognizing that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action").

To date, the *Wit* court has not entered a final judgment on the merits. On March 5, 2019, Chief Magistrate Judge Joseph Spero entered findings of fact and conclusions of law and ruled that UBH is liable to the class under ERISA for its breach of fiduciary duty and for its arbitrary and capricious denial of benefits. *See Wit*, 2019 WL 1033730, at *51–55. But that is not a final judgment, and the *Wit* court is currently presiding over motions regarding the appropriate remedy

and potential class decertification.[3] Indeed, Defendant concedes that at this stage, the *Wit* case is "still pending," ECF No. 54 at 2, and has merely provided "a non-final . . . order," ECF No. 59 at 10. Defendant correctly points out that the potential preclusive effects of the *Wit* class action "cannot be predetermined." *Id.* at 2. But the court has found no legal authority—much less that it is "well-established," as Defendant argues—to suggest that a parallel, pending class action precludes this litigation or warrants dismissal with prejudice.[4] Thus, the *Wit* class action currently

---

[3] *See Wit et al v. United Behavioral Health et al*, 3:14-cv-02346 (N.D. Cal. May 21, 2014), Court Docket Nos. 425 and 426 (hereinafter "*Wit* Dkt. No.").

[4] Defendant misinterprets all of the cases it cites for the proposition that district courts should dismiss or stay an individual case if there is a parallel class action with potential preclusive effects. In *Cooper v. Federal Reserve Bank of Richmond*, the Supreme Court held that a prior judgment in a class action did not preclude a subsequent individual claim raising a distinct theory of liability. *See* 467 U.S. at 878. In *Harrison v. Lewis*, the district court held that although it had ruled in a prior decision that the plaintiffs had not demonstrated the existence of class-wide sex discrimination, specific plaintiffs belonging to the decertified class could still proceed on "individual claims of disparate treatment" because of the distinct nature of those claims. 559 F. Supp. 943, 947 (D.D.C. 1983). In *Crown, Cork & Seal Company v. Parker*, the Supreme Court dealt with an entirely different question: "whether the filing of a class action tolls the applicable statute of limitations." 462 U.S. 345, 346 (1983). The Court ruled that "[t]he filing of a class action tolls the statute of limitations 'as to all asserted members of the class,' not just as to intervenors," which has no bearing on this case. *Id.* at 350 (citation omitted). In *Cimino v. Perrill*, the Tenth Circuit, in an unpublished one-page order, held that a district court correctly ruled that the plaintiff should raise his *Bivens* claim in companion cases filed on the same day, by the same plaintiff, against the same defendants, raising the same theory of liability. *See* 153 F.3d 726, 1998 WL 406826, at *1 (10th Cir. 1998) (unpublished). In *Garcia*, the Tenth Circuit rejected a subsequent collateral attack to the final judgment rendered in a prior class action in which the plaintiffs were adequately represented. *See Garcia v. Bd. of Ed., Sch. Dist. No. 1, Denver, Colo.*, 573 F.2d 676, 679 (10th Cir. 1978). In *Miller*, the Tenth Circuit confronted the unique situation in which a group of plaintiffs filed a new lawsuit to enforce a prior Supreme Court school desegregation order instead of intervening in an existing lawsuit seeking to enforce that order. *See Miller v. Bd. of Ed. of Topeka Unified Sch. Dist. 501*, 667 F.2d 946, 947 (10th Cir. 1982). And in *Sanchez v. Brennan*, the Tenth Circuit dismissed the case for lack of subject matter jurisdiction because the plaintiff had failed to exhaust his administrative remedies and had not opted out of "a class action complaint filed with the EEOC" that had reached a settlement, not because there was any pending similar class action in federal court. *See* 679 F. App'x 671, 672 (10th Cir. 2017). None of these cases make it "well-established" that the court must dismiss or stay this case in favor of a parallel class action, even if it were "premised on the same grounds" as this case. *See* ECF No. 54 at 2.

has no formal preclusive effects on the Plaintiffs' claims and the court declines to dismiss or stay the case on these grounds.[5]

### 2. First-to-File Abstention Doctrine

Defendant does not say so explicitly, but it also appears to argue that the court should dismiss or stay this case based on the Tenth Circuit's quasi-abstention "first-to-file" doctrine. *See* ECF No. 54 at 14. Although "no precise rule" has developed to govern when abstention is proper between two federal district courts addressing parallel litigation, *see Colo. Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), the Tenth Circuit has adopted a "first-to-file" equitable rule to avoid duplicative or inconsistent rulings, *Wakaya Perfection, LLC v. Youngevity Int'l, Inc.*, 910 F.3d 1118, 1124–27 (10th Cir. 2018); *see also Hospah Coal Co. v. Chaco Energy Co.*, 673 F.2d 1161, 1163 (10th Cir. 1982) (recognizing "the general rule that when two courts have concurrent jurisdiction, the first court in which jurisdiction attaches has priority to consider the case"). Similar to *Colorado River* abstention applicable to parallel state and federal litigation, the first-to-file rule "'permits,' but does not require, a federal district court to abstain from exercising its jurisdiction in deference to a first-filed case in a different federal district court." *Wakaya*, 910 F.3d at 1124 (citation omitted). The rule is a discretionary doctrine, resting on principles of comity and conserving judicial resources "to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for

---

[5] The court recognizes that if the *Wit* court proceeds to a final judgment, Defendant may then argue that *res judicata* analysis should unfold differently. To avoid any potential preclusive effects of the outcome in *Wit*, Plaintiffs may be able to request a late opt out from the *Wit* court. *See, e.g.*, *Michael W. v. United Behavioral Health*, No. 2:18-CV-00818-JNP, 2019 WL 4736937, at *11 (D. Utah Sept. 27, 2019) (unpublished) (discussing caselaw regarding late opt out motion directed to the class action court).

a uniform result." *Buzas Baseball, Inc. v. Bd. of Regents of Univ. Sys. of Georgia*, 189 F.3d 477, 1999 WL 682883, *2 (10th Cir. 1999) (unpublished) (internal citation and quotations omitted).

In applying the first-to-file doctrine, the court "cannot resort to a 'rigid mechanical solution.'" *Wakaya*, 910 F.3d at 1124 (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)). Rather, the court considers equitable factors bearing on the prudence of abstaining in a subsequently-filed case: "(1) the chronology of events, (2) the similarity of the parties involved, and (3) the similarity of the issues or claims at stake." *Id.* But these considerations are not exhaustive, and other equitable factors may "merit not applying the first-to-file rule in a particular case." *Id.* at 1127 (quoting *Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 789 (6th Cir. 2016)). "If the court in the second-filed case decides the proper course is to abstain under the first-to-file rule, it may stay the case, transfer it to the first filed court, or, in rare cases, dismiss the case entirely." *Michael W.*, 2019 WL 4736937, at *9 (citation and quotations omitted). Based on material differences between the parties and the issues presented in this case and the *Wit* class action, the court declines to abstain pursuant to the first-to-file doctrine.

### i)       Chronology of Events

First, the court compares the chronology of events in the two concurrent cases. In the Tenth Circuit, "'the first court in which jurisdiction attaches has priority to consider the case' and jurisdiction 'relates back to the filing of the complaint.'" *Wakaya*, 910 F.3d at 1124 (quoting *Hospah Coal Co.*, 673 F.2d at 1163). Here, the *Wit* plaintiffs filed their class action complaint on May 21, 2014. Plaintiffs filed this lawsuit on May 11, 2018. *See* SAC at 1. This factor favors giving priority to the *Wit* court. *See Wakaya*, 910 F.3d at 1124 n.4.

### ii) Similarity of the Parties and the Issues or Claims at Stake

Next, the court considers whether the two cases "bear substantial overlap in (1) the parties and (2) the issues or claims." *Id.* at 1126. The parties "need not be perfectly identical, and the issue must only be substantially similar in that they seek like forms of relief and hinge on the outcome of the same legal/factual issues." *Michael W.*, 2019 WL 4736937 at *9 (internal citations and quotations omitted). When the first-filed case is a class action and the second-filed case is an individual claim, the first-to-file rule counsels in favor of abstention when the class action "covers substantially the same parties and issues and has the potential to completely resolve" the subsequent individual claim. *Baatz*, 814 F.3d at 790. Here, the parties do not substantially overlap. And although the claims raised in the *Wit* class action resemble some of the Plaintiffs' claims at a high level of generality, the theories of liability underlying those claims are distinct. Therefore, deference to the first-filed class action proceedings is not warranted because the parties, issues, and claims do not substantially overlap.

### a) *Overlap of the Parties*

The parties in *Wit* and in this case do not substantially overlap. Plaintiffs in both cases name their insurance plan's claims administrator as the sole defendant. In *Wit*, the claims administrator is UBH. Here, the claims administrator is Oxford. As Plaintiffs highlight, Defendant has not detailed how or why there is a connection between these two separate entities. *See* ECF No. 33 at 4. Defendant's Motion has attached the declaration of Han S. Nguyen, a Legal Services Consultant for another company (Optum, Inc.), which states that "Oxford Health Plans (NY), Inc. and Oxford Health Insurance Inc. ('Oxford') are also affiliates of United Health Group ('United')." ECF 54–1 ¶ 1. But Defendant does not explain the nature of the referenced affiliation, whether Oxford and UBH may be substantially overlapping because of a purported affiliation between Oxford and

United, or why that affiliation is relevant to the first-to-file analysis. Rather, Defendant's briefing fails to address Plaintiffs' argument that Oxford and UBH are distinct entities, *see* ECF No. 59 at 2–5, and Defendant merely concludes that "Plaintiffs' claims clearly fall within the scope of the class claims and definition in *Wit*, and Plaintiffs are precluded from pursuing those claims in this action" without discussing the potential effect of having different defendant claims administrators, *see* ECF No. 54 at 13. Therefore, the court accepts at this stage that Oxford and UBH are distinct entities and concludes that the defendants in *Wit* and in this case do not substantially overlap.

Plaintiffs here and the plaintiff class in *Wit* also do not have substantial overlap for purposes of the first-to-file doctrine. When a class action is the first-filed suit, "the comparison is to the class members, not to the named representatives." *Michael W.*, 2019 WL 4736937 at *10 (collecting cases). Because the first-to-file abstention analysis merely asks whether the parties in the two cases "bear substantial overlap," *Wakaya*, 910 F.3d at 1126, the court need not decide whether Plaintiffs are actually *Wit* class members or if they are eligible to opt out of those proceedings, *see, e.g.*, *Michael W.*, 2019 WL 4736937 at *11 (finding that "putative class members who desire to opt out and pursue their claims on an individual basis must" file a motion with the class action court).[6]

---

[6] Plaintiffs contend that they are not members of the *Wit* class—and by implication are not substantially overlapping parties for purposes of the first-to-file analysis—because Plaintiffs attest that they never "received any notice of class action or certification of the class" and never had an opportunity to opt out. See ECF No. 56 at 6–7. The court notes that Plaintiffs' actual notice argument is likely insufficient by itself to avoid class membership. The Supreme Court has directed that absent class members "must receive notice plus an opportunity to be heard and participate in the [class action] litigation, whether in person or through counsel." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). But under FED. R. CIV. P. 23, absent class members are only entitled to receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort[,]" which may include notice provided through mail, electronic communications, or "other appropriate means." FED. R. CIV. P. 23(c)(2)(b); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–74 (1974) (requiring notice that is "reasonably calculated, under all the circumstances" to "all members who can be identified through reasonable effort" (citations omitted)). In the Tenth Circuit, actual receipt of notice is not necessary, so long as the "best practicable notice" was given to the absent class members. *See*

The relevant *Wit* class covers ERISA plaintiffs "whose request for coverage of residential treatment services for a mental illness or substance use disorder was denied by UBH, in whole or in part, between May 22, 2011 and June 1, 2017, based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines." 2019 WL 1033730, at *4. Here, Plaintiffs' ERISA claims assert that Oxford is the sole entity that wrongfully denied coverage of Daniel Z.'s mental health and substance abuse treatment at a residential treatment facility, wilderness therapy program, and transitional living center from January 8, 2015, to December 23, 2015, and from January 11, 2017, through July 21, 2017. As stated above, Defendant has not explained the connection between Oxford and UBH, and there is no indication in the record that an entity other than Oxford denied Plaintiffs' request for benefits. Defendant has also failed to demonstrate that Oxford uses "UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines," which is a core component of the *Wit* class description. *See* 2019 WL 1033730, at *4. Therefore, neither the plaintiffs nor the defendants in this case and in *Wit* have substantial overlap, which weighs against first-to-file abstention.

---

*DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935, 944 (10th Cir. 2005) (holding that the "due process right does not require *actual* notice to each party intended to be bound by the adjudication of a representative action" (emphasis in original)); *In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1110–11 (10th Cir. 2001) (holding that a class action notice process satisfied Rule 23 and Due Process requirements, even though the record showed that only seventy-seven percent of class members actually received notice). Here, as Defendant points out, the *Wit* court was satisfied that the class administrator would provide the "best notice practicable" through a combination of U.S. mail, email, and Internet publication on two websites, despite the fact that at the time notice was given, the class administrators lacked mailing addresses for "37-38% of class members whose requests for coverage were denied in 2011–13." *Wit* Dkt. No. 263 at 2. This court will not now question the wisdom of that decision. Therefore, the court rejects Plaintiffs' actual notice arguments.

**b)** *Overlap of the Claims*

The next issue is whether the claims in the parallel federal cases substantially overlap. The court need not abstain in favor of the first-filed case when the two cases merely have some similarity but do not substantially overlap. *See Lipari v. U.S. Bancorp NA*, 345 F. App'x 315, 317 (10th Cir. 2009) (unpublished) (observing that the first-to-file rule "does not pertain to distinct controversies arising seriatim"); *see also David S. v. United Healthcare Ins. Co.*, No. 2:18-CV-803, 2019 WL 4393341, at *3 (D. Utah Sept. 13, 2019) (rejecting first-to-file abstention where the defendant "provides the court with no analysis of the ERISA claims each class action allows, whether Plaintiffs' ERISA claim is encompassed by the class actions, and whether the class actions include Parity Act claims"). In other words, "[t]he issues need not be identical, but they must 'be materially on all fours,'" *Baatz*, 814 F.3d at 791 (citations omitted), such that the two cases "hinge on the outcome of the same legal/factual issues," *Michael W.*, 2019 WL 4736937 at *9 (citation omitted). The court recognizes there is some similarity between the issues presented in this case and in *Wit*, but Defendant has not demonstrated that Plaintiffs' ERISA denial of benefits claims or Parity Act claims sufficiently overlap with the *Wit* class action to warrant abstention.[7]

---

[7] The cases Defendant cites in favor of first-to-file abstention are distinguishable because the courts in those cases abstained over claims or counterclaims in a second-filed case that were identical to the claims in the first-filed action. *See Mohn v. Zinke*, 688 F. App'x 554, 556 (10th Cir. 2017) (unpublished) (upholding dismissal where plaintiff filed a lawsuit that relitigated identical claims to benefits that were decided in a 2009 class action settlement, in which plaintiff had submitted a claim but was denied compensation); *Culbertson v. Midwest Uranium Co.*, 132 F. Supp. 678, 680–81 (D. Utah 1955) (applying a version of the first-to-file rule—before the guidance provided in *Wakaya*—to stay subsequent litigation brought during pendency of a prior action in a different federal district court by the same plaintiff, against the same corporation, seeking the same form of relief). Additionally, other cases that Defendant cites for support involve parallel state and federal cases, which are irrelevant to the first-to-file analysis involving parallel federal cases here. *See In re Imprelis Herbicide Mtg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2284, 11-md-02284, 2014 WL 6901120, 2014 U.S. Dist. LEXIS 169559 (E.D. Pa. Dec. 5, 2014) (involving first-filed federal class action settlement and second-filed state court claim by members of the class); *Love v. Blue Cross & Blue Shield Ass'n*, No. 03-21296-CIV-MORENO/TORRES, 2008 U.S. Dist.

Plaintiffs here plead two types of ERISA violations involving Oxford's denial of benefits for the care Daniel Z. received at three different types of mental health/substance abuse treatment facilities. Plaintiffs' First Cause of Action alleges a wrongful denial of benefits cause of action under Section 502(a)(1)(B), in which Plaintiffs contend that Defendant improperly applied Oxford's medical necessity criteria, failed to act solely in Daniel Z.'s interest, acted in an arbitrary and capricious manner by providing inconsistent reasons for its denial, and failed to give Plaintiffs' claims a full and fair review. SAC ¶¶ 80–84. Plaintiffs' Second Cause of Action alleges facial and as-applied violations of the Parity Act's non-discrimination requirements, as enforced through 29 U.S.C. § 1132(a)(3). *Id.* ¶¶ 85–93. Plaintiffs allege that Oxford violated ERISA and the Parity Act when it denied benefits for Daniel Z.'s treatment at Crossroads, a residential treatment center, Open Sky, an outdoor behavioral wilderness therapy program, and Aim House, a transitional living program. Thus, Plaintiffs' lawsuit can be summarized as containing six claims for relief: (1) wrongful denial of benefits for Daniel Z.'s treatment at Crossroads; (2) wrongful denial of benefits for treatment at Open Sky; (3) wrongful denial of benefits for treatment at Aim House; (4) as-applied Parity Act violation involving treatment at Crossroads; (5) as-applied and facial Parity Act violations involving care at Open Sky; and (6) facial Parity Act violation involving treatment at Aim House.

In *Wit*, the district court has found that the defendant violated ERISA under two different theories of liability. First, the class plaintiffs asserted a "Breach of Fiduciary Duty Claim under 29 U.S.C. § 1132(a)(1)(B)," alleging that the claims administrator violated its duty of loyalty, duty of care, and duty to comply with plan terms when it denied the class benefits for residential mental

LEXIS 125171, *59 (S.D. Fla. June 12, 2008) (involving first-filed federal class action and second-filed state individual action).

health and substance abuse treatment services. *See Wit*, 2019 WL 1033730, at *51–54. Second, class plaintiffs asserted a wrongful denial of benefits claim under 29 U.S.C. §§ 1132(a)(1)(B)–(3)(B), alleging that the claims administrator's denial of benefits for residential mental health and substance abuse treatment based on its internal guidelines fell below generally accepted or mandated standards of care. *See id.* at *54–55. The *Wit* court found the defendant liable on both claims. *See id.* at *51–55.

The claims and issues presented in *Wit* and this case do not sufficiently overlap to warrant first-to-file abstention. First, unlike in *Wit*, the Plaintiffs here seek relief under 29 U.S.C. § 1132(a)(3) for alleged violations of the Parity Act. Indeed, Defendant recognizes that "the *Wit* findings do not address claims for [a] violation of the Parity Act." ECF No. 59 at 10. Second, the *Wit* action does not involve claims for benefits for mental health/substance abuse treatment at an outdoor behavioral therapy program or transitional living center, whereas the Plaintiffs seeks benefits for both types of care at Open Sky and Aim House. Therefore, the *Wit* case and this case overlap on at most one of Plaintiffs' claims: the wrongful denial of benefits claim involving Daniel Z.'s treatment at Crossroads, the residential treatment center. But even that claim is distinct from *Wit* because the *Wit* class challenged the *facial validity* of the medical necessity criteria the claims administrator uses as being "more restrictive than generally accepted standards of care," *see* 2019 WL 1033730, at *54–55, while Plaintiffs here challenge Oxford's presumptively valid plan terms and medical necessity criteria as *invalidly applied*, *see* ECF No. 56 at 5. Therefore, the claims or issues presented in this case and in *Wit* do not substantially overlap for purposes of the first-to-file abstention doctrine.

In sum, the chronology of the two lawsuits favors abstention because *Wit* is the first-filed case. But all of the other equitable factors counsel against abstention because this case is brought

by different plaintiffs making distinct claims against a separate claims administrator defendant. Upon weighing these considerations,[8] the court finds that the *Wit* class action and this suit do not have substantial overlap because they involve different parties and do not "hinge on the outcome of the same legal/factual issues," *Michael W.*, 2019 WL 4736937 at *9 (citation omitted). Therefore, the court declines to exercise its equitable power to stay or dismiss this case in favor of the first-filed *Wit* class action.

### C. PARITY ACT PLEADING

Defendant also moves to dismiss Plaintiffs' Parity Act claims, arguing that they are inadequately pled. Defendant advances a stringent pleading standard and contends that Plaintiffs' Parity Act claims should be dismissed because the SAC "does not allege facts to support any of the requisite elements of a Parity Act claim" and it instead "rests on threadbare and conclusory allegations that continue to fall short of Plaintiffs' pleading obligations." ECF No. 54 at 3. Plaintiffs respond that their Parity Act claims are adequately pled because the SAC plausibly alleges that

---

[8] The Tenth Circuit has also observed that "[a]fter determining the sequence and similarities in the cases, courts must also determine whether any equitable considerations merit not applying the first-to-file rule in a particular case." *Wakaya*, 910 F.3d at 1127 (citations and alterations omitted). For example, the first-to-file rule may be eschewed if the case falls into a category of "special circumstances" involving the need to avoid "misuse of litigation in the nature of vexatious and oppressive foreign suits," *O'Hare Int'l Bank v. Lambert*, 459 F.2d 328, 331 (10th Cir. 1972), to ensure the court does not reward forum shopping, *see Span-Eng Assocs. v. Weidner*, 771 F.2d 464, 470 (10th Cir. 1985), and to prevent plaintiffs from filing an anticipatory suit for declaratory judgment, *see Buzas Baseball, Inc.*, 1999 WL 682883, at *3. None of these special circumstances are present here. The Tenth Circuit has not explained which "other equitable factors may bear on the inquiry," *Wakaya*, 910 F.3d at 1124, but has explicitly left open the possibility that "the equitable factors bearing on state-federal concurrent litigation may also apply." *Id.* at 1127. Accordingly, this court has found that other appropriate equitable factors include "(1) 'the avoidance of piecemeal litigation,' (2) 'the sequence in which the courts obtained jurisdiction,' and (3) 'the potential for the [first-filed] court action to provide an effective remedy for the [second-filed] plaintiff.'" *Michael W.*, 2019 WL 4736937, at *14 (quoting *Wakaya*, 910 F.3d at 1122). But the court does not reach these additional equitable considerations here because this case and *Wit* are entirely distinct in that the respective plaintiffs raise dissimilar theories of liability and have sued different defendants.

Oxford applied stricter limitations on providing benefits for mental health/substance abuse care than it applied for analogous medical/surgical care, both on the face of the Plan terms and in applying Oxford's medical necessity criteria and experimental/investigational exclusion policy. As Plaintiffs summarize, the Plan on its face violates the Parity Act because its "purported exclusion of wilderness therapy and transitional living services limits the availability of mental health treatments, and the Plan does not impose the same exclusion on analogous medical/surgical treatments." ECF No. 56 at 15. In addition, Oxford committed as-applied Parity Act violations because its application of its experimental/investigational exclusion policy and "utilization of acute criteria to determine the medical necessity of sub-acute mental health care leads to a 'disparate operation' of the Plan, limiting in effect the availability of mental health treatment the Plan purports to cover." *Id.*

The court finds that based on the available information and the applicable Parity Act pleading standard, Plaintiffs have adequately pled their facial and as-applied Parity Act claims to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Therefore, Defendant's Motion to Dismiss on this basis is denied.

### 1. Parity Act Legal Framework

The Parity Act, codified at 29 U.S.C. § 1185a, is an amendment to ERISA enforced through equitable relief under 29 U.S.C. § 1132(a)(3). *See Christine S. v. Blue Cross Blue Shield of New Mexico*, No. 2:18-CV-00874-JNP-DBP, 2019 WL 6974772, at *6 (D. Utah Dec. 19, 2019). Among other provisions, the Parity Act requires that an ERISA benefits plan "providing for 'both medical and surgical benefits and mental health or substance use disorder benefits' must not impose more coverage restrictions on the latter than it imposes on the former." *Id.* (quoting 29 U.S.C. § 1185a(a)(3)(A)). This parity requirement takes two forms: (1) plan administrators may not apply treatment limitations to mental health benefits that are more restrictive than "the predominant

24

treatment limitations applied to substantially all medical and surgical benefits" and (2) plan administrators may not apply "separate treatment limitations" only to mental health benefits. 29 U.S.C. § 1185a(a)(3)(A)(ii). As this court recently stated, "[i]n effect, the Parity Act prevents insurance providers from writing or enforcing group health plans in a way that treats mental and medical health claims differently." *David S.*, 2019 WL 4393341, at *3 (citing *Munnelly v. Fordham Univ. Faculty*, 316 F. Supp. 3d 714, 728 (S.D.N.Y. 2018) ("Essentially, the Parity Act requires ERISA plans to treat sicknesses of the mind in the same way that they would a broken bone")).

The Parity Act regulations target and prohibit specific unequal "treatment limitations." *See* 29 C.F.R. § 2590.712(a); *see also* 29 U.S.C. § 1185a(a)(3)(B)(iii) (defining "treatment limitations"). Treatment limitations include "both quantitative treatment limitations, which are expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits for treatment under a plan or coverage." 29 C.F.R. § 2590.712(a). Nonquantitative treatment limitations on mental health benefits include "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness, or based on whether the treatment is experimental or investigative" and "restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for services provided under the plan or coverage." *Id.* § 2590.712(c)(4)(ii)(A)–(H). The Parity Act regulations further specify that all "processes, strategies, evidentiary standards, or other factors used in applying" nonquantitative treatment limitations are subject to the statute's parity requirements. *Id.* § 2590.712(c)(4)(i). The parity comparison must be between mental health/substance abuse and medical/surgical care "in the same classification," and the regulations list six classifications: (1) inpatient, in-network; (2)

inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs. *See id.* §§ 2590.712(c)(4)(i) & (2)(ii)(A).

Treatment limitations that violate the Parity Act may be found on the face of the Plan's terms or when the Plan is applied unequally in practice. In other words, "disparate treatment limitations that violate the Parity Act can be either *facial* (as written in the language or the processes of the plan) or *as-applied* (in operation via application of the plan)." *Kurt W.*, 2019 WL 6790823, at *4 (internal citation and quotations omitted) (emphasis in original). The Parity Act regulations offer useful examples for both types of challenges.

Example Nine illustrates a facial Parity Act violation. It contemplates a benefits plan "generally cover[ing] medically appropriate treatments" that still facially violates the Parity Act because it "automatically excludes coverage for inpatient substance use disorder treatment in any setting outside of a hospital," but will cover "inpatient treatment outside of a hospital for . . . medical/surgical conditions" if the insured's "prescribing physician obtain[s] authorization from the plan that the inpatient treatment is medically appropriate." 29 C.F.R. § 2590.712(c)(4)(iii), ex. 9. This plan facially violates the Parity Act by imposing more stringent limitations on substance abuse treatment than for medical/surgical treatment because inpatient care outside of a hospital for substance abuse conditions is *unconditionally excluded* from coverage, but inpatient care outside of a hospital for medical/surgical conditions is only *conditionally excluded* because the patient can meet the condition and receive benefits by having his or her prescribing physician obtain preauthorization. *Id.*; *see also Bushell v. UnitedHealth Grp. Inc.*, No. 17-cv-2021, 2018 WL 1578167, at *6 (S.D.N.Y. Mar. 27, 2018) (applying Example Nine to categorical exclusion of care).

Example Three illustrates an as-applied Parity Act violation. In Example Three, a facially neutral plan "requires prior approval that a course of treatment is medically necessary for

outpatient, in-network medical/surgical, mental health, and substance use disorder benefits and uses comparable criteria in determining whether a course of treatment is medically necessary." 29 C.F.R. § 2590.712(c)(4)(iii), ex. 3. But the plan in application maintains a disparity because the insurer will not pay benefits for mental health/substance abuse treatments that lacked preapproval, but "for medical/surgical treatments that do not have prior approval, there will only be a 25 percent reduction in the benefits the plan would otherwise pay." *Id.* This facially neutral plan violates the statute because "[a]lthough the same nonquantitative treatment limitation—medical necessity—is applied both to mental health and substance use disorder benefits and to medical/surgical benefits for outpatient, in-network services, it is not applied in a comparable way." *Id.*

As the court has recently discussed, the Tenth Circuit has not promulgated a test to determine what is required to state a claim for a Parity Act violation, and district courts have presented varying analyses. *See, e.g.*, *Michael D.*, 369 F. Supp. 3d at 1174–75 (discussing different pleading standards); *Michael W.*, 2019 WL 4736937, at *18 (finding that "[f]or example, Plaintiffs may allege that the Plan contains an exclusion that is discriminatory on its face; the Plan contains an exclusion that is discriminatorily applied between mental health treatment and its clear medical/surgical analog; and/or that the Plan's exclusion is the result of an improper process that violates the Parity Act"). Here, however, the parties principally agree on a three-part analysis that the court will apply in this case: Parity Act plaintiffs must (1) identify a specific treatment limitation on mental health benefits; (2) identify medical/surgical care covered by the plan that is analogous to the mental health/substance abuse care for which the plaintiffs seek benefits; and (3) plausibly allege a disparity between the treatment limitation on mental health/substance abuse

benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog. *See* ECF Nos. 54 at 15–16, 56 at 9.[9]

Applying this test, and following guidance from Parity Act regulations and persuasive decisions from other district courts, the court holds that Plaintiffs have adequately pled their as-applied Parity Act challenge concerning Crossroads, their as-applied and facial Parity Act challenges concerning Open Sky, and their facial Parity Act challenge concerning Aim House.

### 2. Plaintiffs' Facial Parity Claims

The Parity Act prohibits ERISA healthcare plans from facially imposing "more restrictive" or "separate" treatment limitations on mental health/substance abuse care than on medical/surgical care. 29 U.S.C. § 1185a(a)(3)(A)(ii). Defendant denied benefits for Daniel Z.'s care at Aim House because it determined that "[t]ransitional living which is a domiciliary service . . . not a residential

---

[9] During oral argument on January 15, 2020, the parties referenced a four-part Parity Act pleading standard originally espoused by this court in *Michael D. v. Anthem Health Plans of Kentucky, Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019), which follows the test used by some district courts in other circuits, *see, e.g.*, *A.H. by & through G.H. v. Microsoft Corp. Welfare Plan*, No. C17-1889-JCC, 2018 WL 2684387, at *6 (W.D. Wash. June 5, 2018) (unpublished); *Gallagher v. Empire HealthChoice Assurance, Inc.*, 339 F. Supp. 3d 248, 256 (S.D.N.Y. 2018). The four-part test from *Michael D.* and the three-part test to which the parties stipulate here are materially indistinguishable, prompting only slightly different versions of the same basic question: has the ERISA plan or the claims administrator treated benefits determinations for mental health/substance abuse care less favorably than the plan or the claims administrator treats benefits determinations for analogous, covered medical/surgical care. But the court notes that upon further consideration and in the absence of Tenth Circuit guidance, the stipulated three-part test that the court applies in this case may be preferred going forward for two reasons. First, almost all Parity Act decisions applying the *Michael D.* four-part test in this district offer no analysis of the first and second parts because these considerations are often not in contention, which has rendered half the test superfluous. *See, e.g.*, *K.K.*, 2020 WL 262980, at *4; *David S.*, 2019 WL 4393341, at *4. Second, the four-part test does not adequately isolate the analysis of the identified medical/surgical analog covered by the plan, which is an essential element for showing a Parity Act violation because it provides the relevant point of comparison. *See Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155, 1158–59 (9th Cir. 2018) (comparing residential treatment centers to skilled nursing facilities); *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016) (concluding that "Congress enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental health and substance use disorders *as compared to* coverage for medical and surgical conditions." (emphasis added) (citation omitted)).

treatment service" is "not a covered benefit" under the Plan. SAC ¶ 70. Defendant in part denied benefits for Daniel Z.'s care at Open Sky because it categorizes mental health/substance abuse wilderness therapy programs as an "experimental/unproven service" that is excluded from coverage. *Id.* ¶ 44. Plaintiffs contend that denying them benefits for care at Aim House and Open Sky for these reasons shows that the Plan imposes unequal facial treatment limitations in violation of the Parity Act because the Plan's "purported exclusion of wilderness therapy and transitional living services limits the availability of mental health treatments, and the Plan does not impose the same exclusion on analogous medical/surgical treatments." ECF No. 56 at 15.

### i)       Treatment Limitation on Mental Health/Substance Abuse Care

First, Plaintiffs must identify a treatment limitation that Defendant imposed on the type of mental health/substance abuse care Daniel Z. received. *See Michael W.*, 2019 WL 4736937, at *19. Plaintiffs contend that the Plan's categorical exclusion of wilderness therapy programs and transitional living centers is (1) a separate treatment limitation only on mental health/substance abuse benefits, or (2) is a more restrictive limitation "based on geographic location, facility type, [or] provider specialty." SAC ¶¶ 87–88 (quoting 29 C.F.R. § 2590.712(c)(4)(ii)(H)).

This court has ruled that the categorical exclusion of certain types of mental health/substance abuse care is a treatment limitation under the Parity Act. *See, e.g.*, *Joseph F.*, 158 F. Supp. 3d at 1261–62 (residential treatment centers); *Michael D.*, 369 F. Supp. 3d at 1176 (wilderness therapy); *Timothy D. v. Aetna Health & Life Ins. Co*., No. 2:18CV753DAK, 2019 WL 2493449, at *4 (D. Utah June 14, 2019) (unpublished) (wilderness therapy and transitional living center). Defendant concedes that the Plan does not cover wilderness therapy and transitional living centers. ECF No. 54 at 16. Therefore, Plaintiffs have adequately pled that Defendant imposed a facial treatment limitation on mental health/substance abuse benefits by categorically excluding

wilderness therapy and transitional living centers because: (1) the exclusions are because of separate treatment limitations applied only to mental health/substance abuse care; or (2) the exclusions are because of more restrictive treatment limitations based on geographic location, facility type, or provider specialty.

### ii) Analogous Covered Medical/Surgical Treatment

Second, Plaintiffs must identify medical/surgical treatment that is covered by the Plan and analogous to the mental health/substance abuse treatment Daniel Z. received. *See Kurt W.*, 2019 WL 6790823, at *5. Plaintiffs identify "skilled nursing facilities, inpatient hospice care, and rehabilitation facilities" as the relevant medical/surgical analog to the mental health/substance abuse care provided at Open Sky, a wilderness therapy program, and Aim House, a transitional living center. SAC ¶¶ 89, 92. Defendant does not dispute that the Plan covers intermediate, subacute medical/surgical care in a skilled nursing facility (ECF No. 54–1 at 91, 247), inpatient hospice care (*id.* at 35, 87, 190, 244), and an inpatient rehabilitation facility (*id.* at 36, 90, 191, 247). Defendant argues, however, that Plaintiffs have failed to identify a suitable medical/surgical analog because their "attempt to rely generally on a category of intermediary services is insufficient to state a valid Parity Act claim." ECF No. 54 at 19.

Although "there is not a clear analog to wilderness camps in the medical or surgical field," benefits plans subject to the Parity Act "should not be able to exclude mental health treatments only because a clear analog does not exist." *Michael D.*, 369 F. Supp. 3d at 1175. Requiring Plaintiffs to specifically identify the precise medical/surgical analog to the unique type of mental health care provided at a wilderness therapy program or transitional living center "lacks support in common sense. Some medically necessary treatments for severe mental illness have no analog[] in treatments for physical illnesses." *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 716 (9th Cir.

2012). Thus, this court has recognized that Parity Act plaintiffs must only make comparisons to an analogous "*level of care* in a medical/surgical facility" that is covered by the Plan and in the same classification as the mental health/substance care in question. *Michael W.*, 2019 WL 4736937, at *19 n.13; *see also Michael D.*, 369 F. Supp. 3d at 1175 ("The relevant comparison is not whether benefits for wilderness therapy are available for medical/surgical patients, but rather whether the Plan has chosen to provide benefits for skilled nursing facilities and rehabilitation centers for medical/surgical patients, but chosen to deny benefits to those with mental health conditions who seek coverage for a residential treatment center offering wilderness therapy." (citation omitted)).

Multiple courts have recognized that the level of medical/surgical care that Plaintiffs identify—intermediate, subacute treatment at a skilled nursing, inpatient hospice, or inpatient rehabilitation facility—is sufficiently analogous to wilderness therapy programs offering mental health/substance abuse treatment. *See, e.g.*, *Michael W.*, 2019 WL 4736937, at *20 (permitting wilderness camp analogy to "skilled nursing facilities, inpatient hospice care, and rehabilitation facilities"); *K.H.B. ex rel. Kristopher D.B. v. UnitedHealthcare Ins. Co.*, No. 2.18-CV-000795-DN, 2019 WL 4736801, at *5 (D. Utah Sept. 27, 2019) (analogizing to "intermediate programs such as skilled nursing facilities and rehabilitation hospitals").[10] In addition, at least one court has agreed that skilled nursing facilities, inpatient hospice care, and rehabilitation facilities are also the medical/surgical analog to the mental health/substance abuse care that a transitional living center provides. *See Timothy D.*, 2019 WL 2493449, at *4. To dispute this authority and Plaintiffs'

---

[10] District courts in the First, Second, and Ninth Circuits agree that the applicable medical/surgical analog for wilderness therapy is a skilled nursing facility or inpatient rehabilitation facility. *See, e.g.*, *Gallagher v. Empire HealthChoice Assurance, Inc.*, 339 F. Supp. 3d 248, 258 (S.D.N.Y. 2018); *A.Z. ex rel. E.Z. v. Regence Blueshield*, 333 F. Supp. 3d 1069, 1082 (W.D. Wash. 2018); *Vorpahl v. Harvard Pilgrim Health Ins. Co.*, No. 17-CV-10844-DJC, 2018 WL 3518511, at *3 (D. Mass. July 20, 2018).

plausible comparison, Defendant merely states in a conclusory manner that Plaintiffs should not be permitted to "rely generally on a category of intermediary services," without any analysis regarding why the identified medical/surgical treatment is not analogous. ECF No. 54 at 19. Therefore, based on presently available information and the developing caselaw in this jurisdiction, the court accepts that medical/surgical care at a skilled nursing facility, inpatient hospice care, or rehabilitation facility is the relevant analog to mental health/substance abuse care received at a wilderness therapy program, such as Open Sky, and at a transitional living center, such as Aim House.

> ### iii) Plausible *Facial* Disparity Between the Specified Treatment Limitations on Mental Health/Substance Abuse Care and Treatment Limitations on the Covered Medical/Surgical Analog

Third, for a facial Parity Act claim, Plaintiffs must plausibly allege that the Plan imposes "separate treatment limitations" only on mental health/substance abuse services or promulgates "more restrictive treatment limitations" for mental health/substance abuse care than the Plan uses for the analogous covered medical/surgical services. 29 U.S.C. § 1185a(a)(3)(A)(ii). Defendant argues that for Open Sky, the Plan's "exclusion for experimental and unproven treatment, which applies equally to medical/surgical and mental health/substance use treatment, cannot by definition violate the Parity Act." ECF No. 59 at 9 n.5. And concerning Aim House, Defendant argues that the "Plan explicitly excludes custodial care, (i.e., the same kind of 'domiciliary service' that was rendered at Aim House)" and does so whether the custodial care is for mental health/substance abuse or for medical/surgical conditions. ECF No. 54 at 16. Plaintiffs principally respond that Daniel Z. received medically necessary care at Open Sky and Aim House, but Defendant categorically excludes this care by summarily classifying it as "experimental" or "custodial" when

it would not have done so if Plaintiffs had sought medically necessary care in the analogous medical/surgical setting. ECF No. 56 at 12–13.

The court finds that Plaintiffs' allegations regarding the categorical exclusion of wilderness therapy programs and transitional living centers are sufficient to state a Parity Act claim in two respects. First, the Plan's categorical exclusion of benefits for mental health/substance abuse care because Oxford has summarily deemed the treatment to be "experimental" or "custodial" may impose "a separate treatment limitation[]" that the Plan does not apply to medical/surgical care. Oxford denied benefits for Open Sky because Oxford determined that wilderness programs are "experimental/unproven service[s]." SAC ¶ 44. The court has observed that "in practice, wilderness camp exclusions have only been applied to outdoor behavioral and mental health treatment programs, and thus the effect of the limitation is that it imposes a limit on mental health treatment that does not apply to medical or surgical treatment." *Michael W.*, 2019 WL 4736937, at *20 (quoting *Michael D.*, 369 F. Supp. 3d at 1175). Oxford denied benefits for Aim House because it decided, without explanation, that transitional living centers provide "domiciliary service . . . not a residential treatment service." SAC ¶ 70. Upon further development, Plaintiffs may also prove that the Plan only excludes mental health transitional living centers as being uncovered "custodial" care, but it does not exclude analogous medical/surgical care such as that received in a transitional surgery rehabilitation facility for this reason. *See* ECF No. 56 at 16 (using prolonged recovery from hip replacement surgery as an example). Thus, Plaintiffs have adequately pled that Oxford's categorical exclusion of wilderness therapy and transitional living centers may

be a "separate treatment limitation that is applicable only with respect to mental health benefits." *See Joseph F.*, 158 F. Supp. 3d at 1262 (alterations and citation omitted).[11]

Next, Plaintiffs have sufficiently pled that the Plan facially violates the Parity Act by applying "more restrictive treatment limitations" for mental health/substance abuse care than the Plan uses for the identified analogous medical/surgical services. *See* 29 U.S.C. § 1185a(a)(3)(A)(ii). The court finds that Plaintiffs have sufficiently stated a facial Parity Act violation concerning both Open Sky and Aim House under the following three-step analysis. First, the parties agree that the Plan covers medically necessary treatment for both mental health/substance abuse conditions and medical/surgical conditions. Second, the parties also agree that the Plan in part decides the medical necessity of a treatment by looking to "generally-accepted standards of medical practice." *See* ECF No. 54–1 at 55, 212. Here, Plaintiffs plausibly allege that the substance of the treatment Daniel Z. received at Open Sky and Aim House was medically necessary based on the application of generally accepted standards of care to his conditions. *See* SAC ¶¶ 54, 83; *see also Timothy D.*, 2019 WL 2493449, at *2 (finding that "the Plan's exclusion of wilderness therapy, an intermediate sub-acute level of mental health care, may not be in accordance with generally accepted standards of medical care because it prevents beneficiaries from receiving medically necessary care"). Third, Plaintiffs have sufficiently alleged that the Plan categorically excludes mental health/substance abuse care that is generally accepted as medically necessary by applying more restrictive treatment limitations "based on geographic location,

---

[11] The Plan's categorical exclusion of wilderness therapy and transitional living centers also resembles Example Nine from the Parity Act regulations, in which a hypothetical plan facially violated the statute by imposing a separate treatment limitation on substance abuse benefits because the hypothetical plan "automatically exclude[d] coverage for inpatient substance use treatment in any setting outside of a hospital but has no such exclusion for medical treatment." *Bushell*, 2018 WL 1578167, at *6 (describing 29 C.F.R. § 2590.712(c)(4)(iii), ex. 9).

facility type, [or] provider specialty," to wilderness therapy and transitional living centers than it would use for medically-necessary medical/surgical care. *see* SAC ¶¶ 88–89 (citing 29 C.F.R. § 2590.712(c)(4)(ii)(H)).

Stated differently, the purported categorical exclusion of wilderness therapy and transitional living centers based on the Plan terms may impose a more restrictive limitation based on location, facility type, or provider specialty for medically necessary mental health/substance abuse treatment than for medical/surgical care. For wilderness therapy, "excluding mental health treatment merely because it occurs outdoors appears to place a limitation on mental health" that is different or more restrictive than limitations placed on medical/surgical conditions. *Michael D.*, 369 F. Supp. 3d at 1176. The same may be true for medically necessary mental health/substance abuse care received at a transitional living center if the "substance of the treatment" would have been covered had it occurred at a residential treatment center (such as Crossroads), but Oxford denied benefits for Aim House because of the facility type. *See Timothy D.*, 2019 WL 2493449, at *3–4 (permitting Parity Act claim concerning a transitional living center after finding that the defendant improperly "focuse[d] only on the titles of the facilities, not the substance of the treatment"); *see also A.Z.*, 333 F. Supp. 3d at 1078, 1082 (recognizing that unequal treatment "restrictions based on facility type" may violate the Parity Act (alteration omitted)). If Plaintiffs can prove that the substance of the treatment Daniel Z. received at Aim House and/or Open Sky was medically necessary or similar in substance to his covered treatment at Crossroads, and can prove that Oxford would not have made this type of facility or location-based distinction for the analogous medical/surgical care, then the Plan violates the Parity Act by using a "more restrictive treatment limitation" on mental health/substance abuse care.

In sum, Plaintiffs have plausibly alleged two facial disparities to demonstrate that the Plan terms violate the Parity Act: (1) Oxford's categorical prohibition of benefits for wilderness therapy and transitional living center care may indicate that the Plan is using its "experimental" or "custodial" exclusion policies to impose separate treatment limitations only on mental health/substance abuse benefits; and (2) Oxford's categorical exclusion of wilderness therapy and care at a transitional living center may indicate that the Plan's restrictions on "geographic location, facility type, [or] provider specialty" for medically necessary mental health/substance abuse treatment are "more restrictive treatment limitations" than the Plan uses for medically-necessary care in the analogous medical/surgical context.[12]

### 3. Plaintiff's As-Applied Parity Act Claims

Plaintiffs allege that Defendant committed as-applied Parity Act violations in denying benefits for Daniel Z.'s treatment at Crossroads and Open Sky because Oxford's "utilization of acute criteria to determine the medical necessity of sub-acute mental health care leads to a 'disparate operation' of the Plan, limiting in effect the availability of mental health treatment the Plan purports to cover." ECF No. 56 at 15. Moreover, Plaintiffs alternatively contend that Oxford violated the Parity Act by applying its facially neutral "experimental or investigational" treatment exception more restrictively on mental health/substance abuse care at a wilderness program than it would apply to analogous medical/surgical care. *Id.* at 13. For the following reasons, the court finds that Plaintiffs have plausibly alleged as-applied Parity Act violations under both theories.

---

[12] While Oxford "is fully within its right to exclude experimental or unsuccessful types of treatments," the Parity Act prohibits it from "excluding mental health treatment merely because it occurs outdoors" or in a different type of facility in a way that "appears to place a limitation on mental health that does not apply to medical or surgical treatments." *See Michael D.*, 369 F. Supp. 3d at 1176. To avoid a Parity Act violation going forward, Oxford "needs to provide a detailed explanation of why wilderness camps are not covered, especially when Plaintiffs have alleged violations of the Parity Act" during their claims appeal process. *Id.*

### i)      Treatment Limitation on Mental Health/Substance Abuse Benefits

First, Plaintiffs must identify an as-applied treatment limitation that Defendant imposed on the type of mental health/substance abuse care Daniel Z. received. *See Michael W.*, 2019 WL 4736937, at *19. Under Parity Act regulations and a long list of this court's prior decisions, Plaintiffs do not need to identify a specific unequal limitation in the terms of their benefits plan and can pursue "as-applied" challenges. *See* 29 C.F.R. § 2590.712(c)(4)(i); *Michael W.*, 2019 WL 4736937, at *18 (collecting cases). Plaintiffs must only demonstrate that the Defendant imposed "a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits . . . under the terms of the plan (or health insurance coverage) as written *and in operation*" through "any processes, strategies, evidentiary standards, or other factors" that "*are applied . . . more stringently than*, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits." 29 C.F.R. § 2590.712(c)(4)(i) (emphasis added). An example of as-applied treatment limitations include the unequal application of "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness, or based on whether the treatment is experimental or investigative." *Id.* § 2590.712(c)(4)(ii)(A).

Plaintiffs allege sufficient facts to plead two types of as-applied treatment limitations. First, Plaintiffs complain that Oxford applied its facially neutral medical necessity requirements to benefits decisions for Daniel Z.'s mental health/substance abuse care at Crossroads and Open Sky in a way that required them to "satisfy *acute care* medical necessity criteria in order to obtain coverage for residential treatment" for the *subacute* care Daniel Z. received. *see* SAC ¶¶ 90–92 (emphasis added). During the administrative appeals process, claims reviewers stated that the Crossroads and Open Sky treatments were not medically necessary in part because Daniel Z. was

"not a danger to self or others," was "not hearing or seeing things that others do not" was "not in [drug] withdrawal," and did not have "suicidal intent, plan, or behaviors." *See, e.g.*, *id.* ¶¶ 44, 46, 66. Plaintiffs have plausibly alleged that these considerations comprise acute-level criteria. *See id.* ¶¶ 52, 90, 92. Parity Act regulations indicate that residential treatment centers provide an intermediate, subacute level of care for mental health/substance abuse conditions. *See* Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008; Technical Amendment to External Review for Multi–State Plan Program, 78 Fed. Reg. 68,262 (Nov. 13, 2013) ("Final Rules"); *see also Wit*, 2019 WL 1033730, at *17 (summarizing relevant generally accepted standards of care and concluding that "partial hospitalization . . . differs from residential treatment . . . in that it is an acute, crisis-focused level of care"). And this court has recognized that wilderness therapy is "an intermediate sub-acute level of mental health care." *Timothy D.*, 2019 WL 2493449, at *2; *Michael D.*, 369 F. Supp. 3d at 1173 (classifying wilderness therapy as "an intermediate-level of care to treat mental health conditions"). Therefore, Plaintiffs have plausibly alleged that Defendant imposed a specific treatment limitation by applying acute criteria to benefits determinations for subacute care.

Plaintiffs' second as-applied treatment limitation involves the manner in which Oxford applied its experimental/investigational exclusion policy to limit mental health benefits for wilderness therapy programs, such as Open Sky. Defendant in part denied benefits for Daniel Z.'s care at Open Sky because it categorizes mental health/substance abuse wilderness therapy as an "experimental/unproven service" that is excluded from coverage. *See, e.g.*, SAC ¶¶ 35, 40–44. Plaintiffs contend that the "processes, strategies, evidentiary standards, or other factors" that Defendant uses to apply its "experimental/unproven service" exclusion policy to mental health/substance abuse is a treatment limitation. *Id.* ¶ 90. The criteria upon which Defendant makes

its "experimental/unproven service" determinations is presently unknown to Plaintiffs, *see* ECF No. 56 at 13, and to the court because the Plan does not explain these terms or how claims reviewers apply the exclusion policy, *see, e.g.*, ECF No. 54–1 at 111, 114, 119. Accordingly, "[t]he fault for [any] ambiguity," in Plaintiffs' pleadings concerning Oxford's experimental exclusion policy "does not necessarily lie with Plaintiffs because the specifics as to how [Oxford] interpreted and applied the Plan to [Daniel Z.'s] situation is information held within [Oxford's] exclusive control." *See K.K.*, 2020 WL 262980, at \*5. Given the available information, Plaintiffs have plausibly alleged that Defendant's process in applying its experimental/investigational exclusion policy is a specific treatment limitation. Therefore, Plaintiffs have sufficiently pled that Defendant imposed two types of treatment limitations on mental health/substance abuse benefits.

### ii) Analogous Covered Medical/Surgical Treatment

Second, Plaintiffs must identify medical/surgical treatment that is covered by the Plan and analogous to the mental health/substance abuse treatment Daniel Z. received. *See Kurt W.*, 2019 WL 6790823, at \*5. Plaintiffs contend that "skilled nursing facilities, inpatient hospice care, and rehabilitation facilities" are the relevant medical/surgical analogs to the mental health/substance abuse care provided at Crossroads, a residential treatment center, and Open Sky, a wilderness therapy program. SAC ¶¶ 89, 92. Concerning Crossroads, the Parity Act rules explicitly state that skilled nursing and inpatient rehabilitation hospitals are medical/surgical analogs to mental health/substance abuse care at a residential treatment center. *See* Final Rules, 78 Fed. Reg. 68,247. The court has also recognized that medical/surgical treatments offered in inpatient hospice care and inpatient rehabilitation facilities are analogous to mental health/substance abuse care at a residential treatment center. *See, e.g.*, *K.K.*, 2020 WL 262980, at \*4; *Michael W.*, 2019 WL 4736937, at \*19; *Timothy D.*, 2019 WL 2493449, at \*4. Thus, medical/surgical care received at a

skilled nursing, inpatient hospice, or inpatient rehabilitation facility is analogous to the mental health/substance abuse care that Daniel Z. received at the Crossroads residential treatment center.

Concerning Open Sky, the court detailed above when discussing Plaintiffs' facial Parity Act challenges that "there is not a clear analog to wilderness camps in the medical or surgical field." *Michael D.*, 369 F. Supp. 3d at 1175. But this reality does not permit benefits plans to "exclude mental health treatments only because a clear analog does not exist," and courts have repeatedly compared wilderness therapy for mental health/substance abuse conditions to intermediate, sub-acute treatment at a skilled nursing, inpatient hospice, or inpatient rehabilitation facility. *See, e.g.*, *Michael W.*, 2019 WL 4736937, at *20 (permitting wilderness camp analogy to "skilled nursing facilities, inpatient hospice care, and rehabilitation facilities"); *K.H.B.*, 2019 WL 4736801, at *5 (comparing wilderness therapy to "skilled nursing facilities and rehabilitation hospitals"). All three medical/surgical treatments are covered by the Plan. *See, e.g.*, ECF No. 54–1 at 91 & 247 (skilled nursing); 35, 87, 190 & 244 (inpatient hospice care); 36, 90, 191 & 247 (inpatient rehabilitation facility). Therefore, Plaintiffs have sufficiently identified the covered medical/surgical analog for both Crossroads and Open Sky.

### iii) Plausible *As-Applied* Disparity Between the Treatment Limitations on Mental Health/Substance Abuse Care and Treatment Limitations on the Covered Medical/Surgical Analog

Finally, Plaintiffs must allege a disparity between the specified treatment limitations applied to the mental health/substance abuse services for which they sought benefits as compared to the treatment limitations Defendant applies to the identified analogous medical/surgical services. *See Timothy D.*, 2019 WL 2493449, at *3–4. As Defendant acknowledges, Plaintiffs at this stage must only "plausibly allege a disparity in the limitation criteria." ECF No. 54 at 15. To adjudge the plausibility of Plaintiffs' alleged as-applied disparities, the court is guided by the

notion that the Parity Act analysis "counsels against a rigid pleading standard" because of the discrepancy in information between plaintiffs and defendants, particularly related to the treatment limitations that insurers apply to analogous medical/surgical care when the insureds did not receive that care. *Michael W.*, 2019 WL 4736937, at *18 (quoting *Bushell*, 2018 WL 1578167, at *6). Indeed, this court has acknowledged that "a plaintiff need only plead as much of her prima facie case as possible based on the information in her possession," *Timothy D.*, 2019 WL 2493449, at *3 (citation omitted), and Parity Act claims "generally require further discovery to evaluate whether there is a disparity between the availability of treatments for mental health and substance abuse disorders and treatment for medical/surgical conditions," *Michael W.*, 2019 WL 4736937, at *18 (quoting *Timothy D.*, 2019 WL 2493449, at *4); *see also Melissa P. v. Aetna Life Ins. Co.*, No. 2:18-CV-00216-RJS-EJF, 2018 WL 6788521, at *4 (D. Utah Dec. 26, 2018) (observing that "[d]iscovery will allow [plaintiff] to learn and compare the processes, strategies, evidentiary standards, and other factors [the claims administrator] used for sub-acute care in both" mental and medical healthcare coverage contexts). Therefore, Plaintiffs must be given more latitude to plead as-applied disparities because of the lack of available information regarding the relevant point of comparison and the inability for Plaintiffs to glean this information from their administrative claims processes.

With this understanding of the practical challenges Parity Act plaintiffs face, Plaintiffs here have plausibly alleged two as-applied disparities based on Defendant's adverse benefits determinations that may violate the Parity Act. First, Plaintiffs allege that Defendant's "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness" are applied to mental health/substance abuse care using more restrictive "processes, strategies, evidentiary standards, or other factors" than those used for analogous

medical/surgical care. SAC ¶¶ 88, 91. According to Plaintiffs, Defendant committed this violation by requiring them to "satisfy acute care medical necessity criteria in order to obtain coverage for [subacute] residential treatment" for mental health/substance abuse conditions, but "does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits." *Id.* ¶ 90. Plaintiffs' allegation is plausible because Open Sky and Crossroads are intermediate, subacute mental health/substance abuse treatment facilities, but Oxford claims reviewers denied benefits for both programs by applying what Plaintiffs argue are acute-level criteria such as suicidal ideation, risk of harm to others, and hallucinations. *See, e.g.*, *id.* ¶¶ 44, 46, 66. Although Plaintiffs and the court lack information concerning whether Defendant uses acute-level criteria to make benefits determinations for subacute medical/surgical care at an analogous inpatient skilled nursing, hospice, or rehabilitation facility, Plaintiffs plausibly allege that Defendant uses subacute criteria for this type of treatment. *Id.* ¶ 90.[13] And this court has permitted similar claims to proceed past a motion to dismiss to determine what medical necessity criteria is applied to the analogous subacute medical/surgical care. *See Michael W.*, 2019 WL 4736937, at *19. Therefore, Defendant's use of acute-level criteria for subacute mental health/substance abuse care plausibly lacks parity with its alleged use of subacute criteria for analogous subacute medical/surgical care.

Next, Plaintiffs have plausibly pled that Defendant's presently unknown but purportedly facially neutral experimental/investigational exclusion policy is applied more stringently to mental

---

[13] Indeed, the alleged disparate application of acute-level medical necessity criteria only to mental health/substance abuse care resembles Example Three from the Parity Act regulations, in which a facially neutral plan violated the statute because "the same nonquantitative treatment limitation— medical necessity—is applied both to mental health and substance use disorder benefits and to medical/surgical benefits for outpatient, in-network services, [but] it is not applied in a comparable way." 29 C.F.R. § 2590.712(c)(4)(iii), ex. 3.

health/substance benefits than to medical/surgical benefits. Plaintiffs assert that Defendant in part denied benefits for Daniel Z.'s care at Open Sky because Defendant determined that wilderness therapy is an "experimental/unproven service." *See, e.g.*, SAC ¶¶ 35, 40–44. Plaintiffs plead that the "processes, strategies, evidentiary standards, or other factors" that Defendant uses to classify a type of mental health/substance abuse care as "experimental" and therefore subject to its exclusion policy are more restrictive than what Defendant would apply to classify analogous medical/surgical care as experimental. *See id.* ¶¶ 89, 91.

Plaintiffs' allegations are supported by the fact that the Plan's discussion of the external appeals process for experimental/investigational denials only references medical care and does not indicate what process applies to mental health/substance abuse care. *See* ECF No. 54–1 at 285–86. Moreover, other courts have permitted as-applied Parity Act challenges to "a 'categorical' mental-health exclusion without" requiring the plaintiffs to "specify the processes and factors used by a defendant to apply that exclusion—facts that would be solely within a defendant's possession at this stage in the litigation." *A.Z.*, 333 F. Supp. 3d at 1081 (citing *Vorpahl*, 2018 WL 3518511, at *3). Adopting a more demanding requirement, such as "requiring [plaintiffs] to specify the exact process by which [defendant] reached [its] decision on outdoor/wilderness behavioral healthcare programs 'would likely create a serious obstacle' to an otherwise meritorious Parity Act claim." *Id.* at 1082 (quoting *Bushell*, 2018 WL 1578167, at *6). And going even further, at least one district court has indicated that using an experimental exclusion policy to categorically deny "medically necessary services at outdoor/wilderness behavioral healthcare programs" may itself constitute an improper "'process'. . . that qualifies as a discriminatory limitation." *Id.* at 1082 (citing 29 C.F.R. § 2590.712(c)(4)(i)). Thus, based on the limited available information, it is plausible that Defendant applies disparate "processes, strategies, evidentiary standards, or other factors" to

administer its "experimental/investigational" exclusion policy concerning mental health treatments such as wilderness therapy programs.

In sum, Plaintiffs have plausibly alleged two ways in which Oxford used more restrictive "processes, strategies, evidentiary standards, or other factors" in applying its "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness, or based on whether the treatment is experimental or investigative" treatment limitations to mental health/substance abuse care than "the processes, strategies, evidentiary standards, or other factors [that Oxford] used in applying the limitation[s] with respect to medical/surgical benefits." 29 C.F.R. §§ 2590.712(c)(4)(i) & (ii)(A). First, Oxford plausibly applied acute-level criteria to deny benefits for subacute mental health/substance abuse treatment at Crossroads and Open Sky but would have applied subacute criteria to analogous subacute medical/surgical treatment. Second, Oxford plausibly applied its "experimental/investigational" exclusion policy more stringently to mental health services such as wilderness therapy than it would have applied the exclusion policy to analogous medical/surgical services. Therefore, Plaintiffs have plausibly alleged two as-applied Parity Act violations related to Defendant's denial of benefits for Daniel Z.'s care at Crossroads and Open Sky.

## IV.    ORDER

For the foregoing reasons, Defendant's Motion to Dismiss is DENIED.

Signed February 7, 2020

BY THE COURT

_____

Jill N. Parrish
United States District Court Judge

44