IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JONATHAN Z. and DANIEL Z., <br><br> Plaintiffs, <br><br> v. <br><br> OXFORD HEALTH PLANS, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER REGARDING PLAINTIFFS' AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** <br><br> Case No. 2:18-cv-00383-JNP-JCB <br><br> District Judge Jill N. Parrish <br><br> Magistrate Judge Jared C. Bennett |

This action arises under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* The complaint filed by plaintiffs Jonathan Z. and Daniel Z. (collectively, "Plaintiffs") alleges two causes of action: (1) recovery of benefits under 29 U.S.C. § 1132(a)(1)(B) ("benefit denial claim") and (2) violation of the Mental Health Parity and Addiction Equity Act under 29 U.S.C. § 1132(a)(3) ("Parity Act claim"). The case is presently before the court on the parties' cross-motions for summary judgment. The court has also reviewed the notice of supplemental authority and response filed by the parties.

## BACKGROUND

This dispute involves the denial of benefits allegedly due to Plaintiffs under their ERISA employee group health benefit plan sponsored by New York City Specialized Dentistry ("the Plan"). Oxford Health Plans ("Oxford" or "Defendant") administers claims for mental health and substance abuse benefits under the Plan through its Mental Health/Substance Use Administrator,

United Behavioral Health ("UBH"). Rec. 1160. As an employee of New York City Specialized Dentistry, Jonathan was a Plan participant at all times relevant to the claims in this case and his son, Daniel, was a Plan beneficiary. *Id.* 1-2, 149-50.

Plaintiffs sought care for Daniel's mental health and substance abuse conditions at three successive programs. Daniel first received treatment at Open Sky Wilderness Therapy ("Open Sky") from January 8, 2015 until April 7, 2015. *Id.* 591-94. Daniel was discharged from Open Sky directly to Crossroads Academy ("Crossroads") where he received treatment from April 8, 2015 through December 23, 2015. *Id.* 3727. Daniel spent several years out of residential care, but when his health problems resurfaced, he was admitted to Aim House, a young adult treatment facility in Colorado on January 11, 2017. Oxford denied coverage for all of Daniel's care at Open Sky and Aim House, and all but one week of care at Crossroads. *Id.* 307-67, 914-16, 1109-10.

## I.    THE PLAN

The Plan covers "inpatient mental health care services relating to the diagnosis and treatment of mental, nervous and emotional disorders comparable to other similar Hospital, medical, and surgical coverage provided under this Certificate." *Id.* 83. Under the Plan,

> [c]overage for inpatient services for mental health care is limited to Facilities defined in New York Mental Hygiene Law Section 1.03(10) such as:
> - A psychiatric center or inpatient Facility under the jurisdiction of the New York State Office of Mental Health;
> - A state or local government run psychiatric inpatient Facility;
> - A part of a Hospital providing inpatient mental health care services under an operating certificate issued by the New York State Commissioner of Mental Health;
> - A comprehensive psychiatric emergency program or other Facility providing inpatient mental health care that has been issued an operating certificate by the New York State Commissioner of Mental Health;
> and, in other states, to similarly licensed or certified Facilities.

*Id.* The New York Mental Hygiene Law § 1.03(10) defines a "Hospital" as

the in-patient services of a psychiatric center under the jurisdiction of the office of mental health or other psychiatric in-patient facility in the department, a psychiatric in-patient facility maintained by a political subdivision of the state for the care or treatment of the mentally ill, a ward, wing, unit, or other part of a hospital . . . operated as part of such hospital for the purpose of providing services for the mentally ill pursuant to an operating certificate issued by the commissioner of mental health, a comprehensive psychiatric emergency program which has been issued an operating certificate by such commissioner, or other facility providing in-patient care or treatment of the mentally ill which has been issued an operating certificate by such commissioner.

The Plan also covers "inpatient mental health care services relating to the diagnosis and treatment of mental, nervous and emotional disorders received at Facilities that provide residential treatment, including room and board charges." Rec. 83. However, "[c]overage for residential treatment services is limited to Facilities defined in New York Mental Hygiene Law Section 1.03(33) and to residential treatment facilities that are part of a comprehensive care center for eating disorders . . . and, in other states, to Facilities that are licensed or certified to provide the same level of treatment." *Id.* New York Mental Hygiene Law § 1.03(33) defines a "residential treatment facility for children and youth" as

an inpatient psychiatric facility which provides active treatment under the direction of a physician for individuals who are under twenty-one years of age . . . Residential treatment facilities for children and youth are a sub-class of facilities defined to be "hospitals" in subdivision ten of this section.

However, the Plan offers such benefits only where care is medically necessary. Rec. 197 ("You will receive Covered Services under the terms and conditions of this Certificate only when the Covered Service is: Medically Necessary . . . ."). The Plan deems services medically necessary only if:

- They are clinically appropriate in terms of type, frequency, extent, site, and duration, and considered effective for Your illness, injury, or disease;
- They are required for the direct care and treatment or management of that condition;
- Your condition would be adversely affected if the services were not provided;

- They are provided in accordance with generally-accepted standards of medical practice;
- They are not primarily for the convenience of You, Your family, or Your Provider;
- They are not more costly than an alternative service or sequence of services, that is at least as likely to produce equivalent therapeutic or diagnostic results;
- When setting or place of service is part of the review, services that can be safely provided to You in a lower cost setting will not be Medically Necessary if they are performed in a higher cost setting. For example, We will not provide coverage for an inpatient admission for surgery if the surgery could have been performed on an outpatient basis.

*Id.* 198-99. To determine whether a service is medically necessary, the Plan may take into account:

- Your medical records;
- Our medical policies and clinical guidelines;
- Medical opinions of a professional society, peer review committee or other groups of Physicians;
- Reports in peer-reviewed medical literature;
- Reports and guidelines published by nationally-recognized health care organizations that include supporting scientific data;
- Professional standards of safety and effectiveness, which are generally-recognized in the United States for diagnosis, care, or treatment;
- The opinion of Health Care Professionals in the generally-recognized health specialty involved;
- The opinion of the attending Providers, which have credence but do not overrule contrary opinions.

*Id.* 198.

The Plan grants Oxford the right to develop guidelines or standards to describe medical necessity in more detail. *Id.* 134, 291. Accordingly, Oxford adopted the Optum Level of Care Guidelines for Residential Treatment Centers. The Optum Guidelines indicate that

> [t]he course of treatment in Residential Treatment Center is focused on addressing the "why now" factors that precipitated admission (e.g., changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning) to the point that the member's condition can be safely, efficiently and effectively treated in a less intensive level of care.

*Id.* 3783. The Optum Guidelines list the following admission criteria specifically for RTC care, in addition to the common criteria for all levels of care:

- The member is not in imminent or current risk of harm to self, others, and/or property; and
- The "why now" facts leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors. Examples include
    - Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.
    - Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.

*Id.* The continued service criteria for RTC care include:

- The admission criteria continue to be met and active treatment is being provided. For treatment to be considered "active" services must be:
    - Supervised and evaluated by the admitting provider;
    - Provided under an individualized treatment plan that is focused on addressing the "why now" factors, and makes use of clinical best practices;
    - Reasonably expected to improve the member's presenting problems within a reasonable period of time.
- Treatment is not primarily for the purpose of providing custodial care. Services are custodial when they are any of the following:
    - Non-health-related services, such as assistance in activities of daily living (examples include feeding, dressing, bathing, transferring and ambulating).
    - Health-related services that are provided for the primary purpose of meeting the personal needs of the patient or maintaining a level of function (even if the specific services are considered to be skilled services), as opposed to imposing that function to an extent that might allow for a more independent existence.
    - Services that do not require continued administration by trained medical personnel in order to be delivered safely and effectively.

*Id.* 3784-86. And in order to qualify for discharge from an RTC under the Optum Guidelines, the continued stay criteria must no longer be met. Examples include:

- The "why now" factors which led to admission have been addressed to the extent that the member can be safely transitioned to a less intensive level of care, or no longer requires care.
- The "why now" factors which led to admission cannot be addressed and the member must be transitioned to a more intensive level of care.
- Treatment is primarily for the purpose of providing social, custodial, recreational, or respite care.
- The member requires medical-surgical treatment.
- The member is unwilling or unable to participate in treatment and involuntary treatment or guardianship is not being pursued.

*Id.* 3577.

The Plan also contains a preauthorization requirement for out-of-network benefits. *Id.* 301. Should a Plan participant fail to seek preauthorization for out-of-network benefits, the Plan "will pay an amount $500 less than We would otherwise have paid for the care, or We will pay only 50% of the amount We would otherwise have paid for the care, whichever results in a greater benefit for You." *Id.* 302.

Finally, the Plan contains provisions regarding the timeframe for filing claims. *Id.* 104. Plan participants or beneficiaries must submit a claim for services to Oxford within 120 days after the patient receives the services for which payment is being requested. *Id.* However, "[i]f it is not reasonably possible to submit a claim within the 120 day period, [the claimant] must submit it as soon as reasonably possible." *Id.*

## II. DANIEL'S CONDITION

Daniel began using drugs at a young age. *Id.* 3551. Although he went to family therapy and worked with counselor Jayne Eliach, RN, MS, Daniel continued to abuse drugs and became more volatile as he aged. *Id.* 3552. Daniel was admitted to Greenwich Hospital twice, once after he threatened to commit suicide in November 2012 and another time after police found him in a drunken fit of anger in October 2013. *Id.* 3552-53. During this time Daniel was also diagnosed with ADHD, anxiety, and depression. *Id.* 3553. Daniel worked with several mental health

professionals, but his significant substance abuse problems prevented his providers from making progress on his mental health issues. *Id.* 3553-54.

Daniel left for college at Hofstra University in the fall of 2014. *Id.* 3554. Daniel used substances heavily during his first semester in college. *Id.* When Daniel returned for winter break, he continued his pattern of regularly using drugs. *Id.* Daniel's temper was volatile. *Id.* Finally, after "Daniel showed disrespect to Jonathan" on December 27, 2014, Daniel's parents gave him an ultimatum. *Id.* They told him that he had to attend a treatment program or else they would kick him out of the house. *Id.* After leaving home for ten days, Daniel consented to go to Open Sky. *Id.*

## III.   DANIEL'S TREATMENT AND DENIAL OF BENEFITS

### A.   *Open Sky*

Daniel was admitted to Open Sky on January 8, 2015. *Id.* 591. His treatment team diagnosed him with (1) generalized anxiety disorder; (2) cannabis use disorder; (3) major depression disorder; and (4) parent-child relational problem. *Id.* 594. Open Sky discharged Daniel on April 7, 2015. *Id.*

Plaintiffs received a series of Explanation of Benefits ("EOB") letters covering Daniel's time at Open Sky. In EOB letters dated May 7, 2015, Oxford denied coverage from January 15, 2015 to March 31, 2015 because Plaintiffs failed to get preauthorization. *Id.* 313-14, 319-20, 331-32, 343-44, 355-56. In EOB letters dated June 22, 2015, Oxford similarly denied coverage for treatment of Daniel's "generalized anxiety disorder" from February 1, 2015 to April 7, 2015 because Plaintiffs failed to get preauthorization. *Id.* 325-26, 337-38, 349-50, 361-62, 367-68. Together, these EOBs indicate that Oxford denied Daniel coverage at Open Sky from January 15, 2015 to April 7, 2015 for lack of preauthorization. Finally, in an EOB letter dated June 15, 2015,

Oxford denied coverage for treatment of Daniel's "generalized anxiety disorder" from January 8, 2015 to January 31, 2015 because the claim was not timely filed. *Id.* 307-08.

Plaintiffs filed a level one appeal on October 26, 2015. *Id.* 482-88. Regarding the preauthorization denials, Plaintiffs argued that the Plan provided for a retrospective review, not a mandatory denial, if a patient failed to obtain preauthorization. *Id.* 484-87. As to the timeliness denials, Plaintiffs contended that they submitted claims for Daniel's stay from January 15, 2015 through April 7, 2015 on April 21, 2015, well within the 120-day timeframe provided by the Plan. *Id.* 486-87. After Plaintiffs realized that they had omitted claims for services provided from January 8, 2015 through January 14, 2015, they submitted a corrected claim for dates of service January 8, 2015 through January 31, 2015 on June 10, 2015. *Id.* 487. Plaintiffs represent that they submitted the corrected claim as soon as reasonably possible, and fewer than thirty-five days after the 120-day window closed. *Id.*

On November 30, 2015, Oxford replied to Plaintiffs' level one appeal. *Id.* 666-69. Resolving Analyst Vivek R. indicated that Oxford upheld the denial of benefits "because the submission of the claim(s) was received after the 120-day filing deadline." *Id.* 666.

On June 16, 2016, Plaintiffs submitted a consumer complaint to the New York State Department of Financial Services. *Id.* 470-77. The New York State Department of Financial Services replied on May 4, 2017, finding that Plaintiffs failed to submit their claim in the time frame allowed under the Plan. *Id.* 433. The letter further noted that "[i]f your certificate states that preauthorization is required and you fail to get the prior authorization your claim can be denied for that reason." *Id.* Finally, the letter notes that "[t]he health plan has submitted documentation to us showing the Open Wilderness is licensed as a residential child care facility

and not a residential treatment center therefore they would not be required to pay for these services." *Id.*

The letter from the Department of Financial Services includes comments that the Department collected from Oxford/UBH after it reviewed Plaintiffs' case at the Departments' request. And for the first time, Oxford stated that "Oxford/UBH's denial is based on the determination that the services being rendered are experimental/investigational." *Id.* 437. Oxford elaborated, stating that

> [W]ilderness therapy is experimental/investigational and not medically necessary for the treatment of emotional, addiction, and/or psychological problems including, but not limited to adjustment disorders, mood disorders, anxiety disorders, conduct disorders, impulse disorders, social functioning disorders, substance related disorders, and attention-deficit hyperactivity disorders. There is inadequate evidence of the safety and efficacy of wilderness therapy for treating these conditions. Weak study designs, safety concerns, inadequately trained staff, and questions of long-term benefit are key limitations.

*Id.* Moreover, Oxford expressed the following concerns based on academic research into wilderness studies:

> The wilderness therapy literature contains a number of studies that suggest participants show some level of improvement on both behavioral health outcomes and recidivism rates for juvenile offenses. However, there are substantial limitations in the research methodology used to examine many of these programs. Most notably, there is a lack of randomized controlled trials or well-designed cohort studies that would allow causal conclusions about the impact of wilderness therapy to be drawn. There is also a lack of demonstrated durability of effect: few of the reviewed studies included follow-up measures, none of which included follow-up of a comparison group. The reviewed studies and guidelines did not reveal conclusive positive health outcomes, or that Wilderness Therapy was equivalent to or better than procedures currently in use. Further there is explicit comment of concern for safety in the use of many Wilderness Therapy programs; in their safety report, the GAO notes thousands of complaints of abuse and even death related to wilderness programs. There is extensive variability in the length, design, and fidelity of the programs themselves as noted by many of the authors of the reviewed research studies. Authors note that for wilderness therapy to become a more formal part of the mental health delivery system, the field will need to be willing to conform to the standards of other ancillary health care

> providers. Particularly, higher standards of staff training and credentialing will be
> necessary, along with a more robust evidence base.

*Id.* Oxford cites a single study, Berman & Davis Berman, 2013, to support its discussion of

academic studies on wilderness therapy programs. *Id.*

The appeal to the New York State Department of Financial Services appears to have

triggered a retroactive review at Oxford. *Id.* 3512. On July 27, 2016, Dr. Jha entered a note in

Oxford's internal system denying coverage based on his determination that wilderness therapy

qualified as experimental treatment. *Id.* 3512-13, 3496. The record does not indicate whether

Oxford communicated Dr. Jha's findings in a letter to Plaintiffs. However, Dr. Jha's notes include

much of the same reasoning that Plaintiffs received via the letter from the New York State

Department of Financial Services.

On October 4, 2017, Plaintiffs submitted another level one appeal. *Id.* 411-25. This

appeal responded to Oxford's newly expressed rationale, that the plan did not cover wilderness

therapy programs. Plaintiffs submitted a number of academic studies supporting the use of

wilderness therapy to treat mental health challenges in adolescents. *Id.* 419-22.

On January 12, 2018, Oxford confirmed its denial of coverage. *Id.* 385-402. This time,

Oxford's reviewer, Dr. Jones, addressed Daniel, finding that

> [y]ou were admitted for treatment of problems with your mood, behavior, and
> addiction. After reviewing the available information, it is noted that your
> condition did not meet Guidelines for coverage of treatment in this setting. You
> were stable from a medical and mental health standpoint. You were not in
> withdrawal. You were not thinking about hurting yourself or others. You were not
> hearing or seeing things that others do not. You had the support of your family.
> You did not require 24-hour nursing care. In addition, you were in a wilderness
> therapy program. Wilderness therapy is considered experimental and unproven. It
> is not covered under your health plan. You could have continued care in the
> Mental Health Intensive Outpatient Program setting.

10

*Id.* 387. In sum, Oxford appeared to have abandoned its timeliness and preauthorization justifications in favor of medical necessity and experimental treatment rationales. Plaintiffs filed no further appeals for Daniel's care at Open Sky with Oxford.

### B.    Crossroads

On the advice of Daniel's treatment team at Open Sky, Daniel began treatment at Crossroads on April 8, 2015, immediately following his discharge from Open Sky. *Id.* 594, 1037. Daniel remained at Crossroads through December 23, 2015. *Id.* 1044. While at Crossroads, Daniel received treatment for (1) generalized anxiety disorder, (2) major depressive disorder, (3) cannabis use disorder, and (4) alcohol use disorder. *Id.* 1037.

Oxford initially covered seven days at Crossroads, from April 8, 2015 to April 15, 2015. *Id.* 816. "Coverage" for an out-of-network provider meant that Oxford paid 50% of the bill for Daniel's stay on those dates. *Id.* 817. Oxford then denied coverage from April 15, 2015 to July 31, 2015 due to lack of medical necessity. *Id.* 822-23, 828-29, 834-35, 841. On April 15, 2015, Oxford sent Daniel a letter stating that

> You were admitted for treatment of Depression. It is reported that you made progress and no longer need the type of care and services provided in this setting. You are not a danger to self or others. You have no medical issues. You are active in treatment. Care could continue as an outpatient.

*Id.* 914.

Oxford denied coverage from August 1, 2015 through August 31, 2015 because Plaintiffs failed to timely file their claims. *Id.* 847. Oxford then denied coverage from September 1, 2015 through December 23, 2015 due to lack of preauthorization. *Id.* 853, 859, 865, 871.

On September 29, 2015, Plaintiffs submitted a level one appeal for Oxford's denial of care at Crossroads. *Id.* 3547-62. Plaintiffs contended that the reviewer failed to consider Daniel's dual diagnosis for both mental health and substance use issues—instead, Plaintiffs argued, the

11

reviewer considered only Daniel's mental health issues. *Id.* 3548. Plaintiffs also objected to the reviewer's application of the Optum Level of Care Guidelines for Mental Health Residential Treatment to the facts of Daniel's case. *Id.* 3548-58. Additionally, Plaintiffs raised concerns, articulated in two separate class actions pending in United States District Court, with the UBH Level of Care Guidelines and Coverage Determination Guidelines. *Id.* 3558-61. Finally, Plaintiffs contended that the UBH Level of Care Guidelines failed to comply with the Parity Act. *Id.* 3561-62.

Oxford responded on October 21, 2015. *Id.* 922-23. Oxford upheld its denial of coverage from April 15, 2015 forward, stating that

> The member was admitted for treatment of anxiety concerns. After reviewing the facility medical records, it was noted the member had made progress and the member's condition did not meet Guidelines for further coverage of treatment in this setting. The member had worked on his recovery by attending therapy sessions. The member did not have medical or mental health concerns needing 24-hour care. The member was not acting on every feeling. The member was thinking clearly. The member was doing your daily tasks. At least weekly psychiatric consultations are not occurring. The care could continue in the Mental Health Outpatient setting.

*Id.* at 922.

On February 25, 2016, Oxford sent Plaintiffs a revised version of the October 21, 2015 letter. *Id.* 988-89. The revised letter contained the same reasoning, but additionally noted that this was the "<u>Final Adverse Determination</u> of your appeal and it is considered by New York State law to be a determination of medical necessity." *Id.* 989.

On February 15, 2016, Plaintiffs submitted a request for review by an independent organization to the New York State Department of Financial Services. *Id.* 3727-41. Plaintiffs attached their level one appeal and again argued that UBH failed to consider Daniel's dual

diagnosis and that Daniel would have qualified for continued coverage under UBH's guidelines had UBH properly applied its coverage guidelines. *Id.* 3728.

IPRO, an independent external appeal organization, responded on March 24, 2016. *Id.* 1047. A physician with board certification in child and adolescent psychiatry reviewed Daniel's case on behalf of IRPO. *Id.* The reviewer "agree[d] with the decision to deny continued mental health residential treatment at Crossroads" because "the chart notes do not provide enough specific evidence to support that he could only be treated in a 24 hour residential treatment or could not be treated in a less restrictive level of care as of then." *Id.* 1049. The reviewer noted that while "this patient had past reported significant depression and suicidal thinking as well as past physical aggression and property destruction," Daniel had not exhibited such behaviors "as of 4/15/15 and forward." *Id.* As evidence, the reviewer cited chart notes at Crossroads, which "reported that he had an appropriate mood, no suicidal/homicidal ideation, had no danger risk, appropriate thought process and content, and had focused concentration." *Id.* 1050. Moreover, the reviewer stated that "[e]ven notes 7/15/15, 8/17/15, 9/15/15, 11/3/15, and 12/8/15 reported this." *Id.* Finally, the reviewer noted that "[t]he chart notes did not provide specific identifiable and quantifiable treatment goals or objectives that could only be achieved in a 24 hour residential treatment or that could not be achieved in a less restrictive setting as of then." *Id.*

### C.    *Aim House*

Daniel spent several years out of residential treatment. However, on January 11, 2017, Daniel began treatment at Aim House to continue to address his mental health and substance abuse issues. *Id.* 1116. Plaintiffs assert they completed preauthorization for Daniel's treatment at Aim House on January 13, 2017 but never received an official denial from Oxford as to their preauthorization request. *Id.* 1116. UBH's records indicate that on January 13, 2017, Sara from

Aim House called requesting authorization for transitional living. *Id.* 3525. Sara "confirmed that this is not a request for IOP [Intensive Outpatient Program], PHP [Partial Hospitalization Program], or any other form of t[reatment] and is for transitional living only." *Id.* UBH's notes indicated that its representative "explained that this is not a covered service." *Id.* However, Plaintiffs did not receive any written denial letter at this point.

After Plaintiffs did not receive any communication from Oxford for several months, Plaintiffs' healthcare advocate called UBH to inquire as to the status of the denial letter. *Id.* 1116. A UBH representative, Nurseta, indicated that a denial letter had not been written. *Id.* Plaintiffs' healthcare advocate requested that Nurseta resubmit the request for a denial letter, but Plaintiffs still did not receive an official denial letter. *Id.* Instead, Aim House submitted claims for their services to Oxford on May 26, 2017. *Id.* 1117. Oxford responded to the claims with several EOBs. Each EOB cited lack of preauthorization in denying the claim. *Id.* 1134, 1140, 1146, 1152. However, UBH also sent a letter to Daniel, at the Aim House address, dated January 18, 2017, which stated that Oxford was denying coverage because "coverage is not available under your benefit plan for the requested services of transitional living." *Id.* 1109. Plaintiffs claim that Oxford backdated this letter because a UBH representative told Jonathan that the letter did not exist prior to June 22, 2017. *Id.* 1120. However, UBH's internal notes indicate that the January 18, 2017 adverse determination letter was "prepared and faxed to the member, provider and facility" on January 18, 2017. *Id.* 3525. Accordingly, there is some confusion in the record as to when UBH communicated its denial to Plaintiffs. However, there is no confusion that UBH denied the request for preauthorization at Aim House. In other words, Plaintiffs did not obtain preauthorization for Daniel's stay at Aim House.

On December 4, 2017, Plaintiffs submitted a level one appeal. *Id.* 1115-21. Plaintiffs also addressed the letter to the New York State Department of Insurance in order to file a formal complaint against UBH. *Id.* 1115. The appeal (1) raised the procedural irregularities that Plaintiffs perceived in the claims process, (2) argued that Oxford incorrectly determined the Plan did not cover domiciliary services, and (3) argued that the Plan violated the Parity Act. *Id.* 1116-21.

Oxford replied to Plaintiffs' level one appeal with a notice of final adverse determination on December 22, 2017. *Id.* 1180. The letter affirmed the coverage denial because "[t]he transitional living program is not covered by your insurance plan." *Id.* 1181.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Because both parties have moved for summary judgment on the denial of benefits count, the parties have effectively "stipulated that no trial is necessary" and thus "summary judgment is merely a vehicle for deciding the case." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted). Moreover, for purposes of the denial of benefits claim, "the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *Id.* (citation omitted).

Unlike the denial of benefits count, the court affords Oxford no deference in interpreting the Parity Act because the interpretation of a statute is a legal question. *See Joseph F. v. Sinclair*

*Servs. Co.*, 158 F. Supp. 3d 1239, 1258 (D. Utah 2016) (citing *Foster v. PPG Indus. Inc.*, 693 F.3d 1226, 1233 (10th Cir. 2012)).

**ANALYSIS**

The cross-motions for summary judgment present a number of issues for the court's analysis. The court begins by addressing the proper standard of review for the denial of benefits claims. The court then applies the *de novo* standard of review to Plaintiffs' claims for denial of benefits at Open Sky and Crossroads. The court next applies the arbitrary and capricious standard of review to Plaintiffs' claim for denial of benefits at Aim House. The court then turns to Plaintiffs' Parity Act arguments, first as to Open Sky and Crossroads, then as to Aim House.

## I.   STANDARD OF REVIEW FOR DENIAL OF BENEFITS CLAIM

The court must first determine the proper standard of review to evaluate Oxford's denial of benefits for Daniel's treatment at Open Sky, Crossroads, and Aim House. ERISA authorizes Plaintiffs to challenge a denial of benefits under 29 U.S.C. § 1132(a)(1)(B) but fails to specify the standard of review that courts should apply. *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009). The Supreme Court has filled this gap by determining that, in general, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where a plan vests such discretion in the plan administrator, a reviewing court will instead apply "a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citations and internal quotation marks omitted).

Here, the parties do not dispute that the Plan expressly gives Oxford and UBH the discretion to develop criteria and determine whether a claimant is entitled to benefits under the Plan. But even where a claims administrator has discretion, a court may apply a less deferential standard if a claims administrator's decision failed to comply with ERISA's procedural requirements. *See Rasenack*, 585 F.3d at 1316-17.

Oxford argues that the court must grant deference to its reviewers' determinations because the Plan grants it discretionary authority to make coverage decisions under the Plan, and because it complied with ERISA's procedural requirements. On the other hand, Plaintiffs argue that the court should apply *de novo* review because (1) the New York State Insurance Commissioner has banned insurers from using discretionary authority clauses[1] and (2) Oxford's benefits determinations and appeals process suffered from procedural irregularities. Because the court will ultimately evaluate the denial of benefits claims for each facility separately, the court considers the alleged procedural deficiencies as to the claims/appeals process for each facility independently.

### A.    *Open Sky*

Plaintiffs argue that Oxford violated ERISA's procedural requirements by changing rationales for its denial of benefits at Open Sky midway through the appeals process. Oxford responds that "UBH's claim notes and letters consistently reflect that Daniel Z.'s claim for coverage of his treatment at Open Sky was denied because it was not Medically Necessary. More

---

[1] Plaintiffs later retracted this argument, *see* ECF No. 151 at 14 n.54, after conceding that the New York Insurance Commission Circular Letter cited by Plaintiffs has been with withdrawn and does not form an independent basis for a *de novo* review.

Moreover, the court notes that Plaintiffs' arguments regarding bans on discretionary clauses in Utah and Connecticut are inapposite because the Plan contains a choice of law provision providing that the Plan "shall be governed by the laws of the State of New York." Rec. 9.

specifically, wilderness programs, like Open Sky are not supported as an accepted modality of treatment." ECF No. 138 at 44.

But Oxford is simply wrong. Oxford initially denied coverage for Daniel at Open Sky because the claim was not timely filed (January 8, 2015 – January 31, 2015) and because Plaintiffs failed to obtain preauthorization (January 15, 2015 – April 7, 2015). Oxford then issued a letter dated June 15, 2015 denying coverage for Daniel's treatment because Plaintiffs failed to timely file the claim. And Oxford issued a response to Plaintiffs' level one appeal upholding the benefits denial "because the submission of the claim(s) was received after the 120-day filing deadline." Rec. 666. For the first time on external review—on May 4, 2017, nearly two years after Oxford issued its initial EOBs citing untimeliness and lack of preauthorization—Oxford raised the argument that Open Sky constituted experimental wilderness therapy. Regardless of whether Oxford properly excluded wilderness therapy from coverage, ERISA requires Oxford to "set forth the specific reasons for such denial, written in a manner calculated to be understood" by Plaintiffs and to provide a "reasonable opportunity . . . for a full and fair review by the . . . fiduciary of the decision denying the claim." 29 U.S.C. § 1133. In other words, Oxford must "engage in meaningful dialogue" with Plaintiffs through the appeals process. *See Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1168 n.4 (10th Cir. 2007).

But the parties cannot engage in meaningful dialogue where Oxford offers shifting rationales for its denial. Indeed, "shifting rationales" indicate the "type of self-interested decision-making" that "contravenes the purpose of ERISA and is the essence of an abuse of an insurance provider's discretion." *Collins v. Liberty Life Assurance Co. of Bos.*, 988 F. Supp. 2d 1105, 1130 (C.D. Cal. 2013); *see also Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011) ("The continual shifting of the plan's grounds for denial also suggest

abuse of discretion."); *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008) ("[C]oming up with a new reason for rejecting the claims at the last minute suggests that the claim administrator may be casting about for an excuse to reject the claim rather than conducting an objective evaluation."). By shifting rationales from untimeliness and lack of preauthorization to the inadequacy of wilderness therapy, Oxford engaged in the type of procedural irregularity prohibited by ERISA.

The court thus finds that Oxford acted procedurally arbitrarily regarding Plaintiffs' Open Sky claim. Accordingly, Plaintiffs are entitled to *de novo* review of the Open Sky claim.

### B. Crossroads

With regard to their claim for denial of benefits at Crossroads, Plaintiffs argue that Oxford violated ERISA's procedural requirements by failing to take into account all of Daniel's mental health and substance use disorder conditions when determining medical necessity.[2] Specifically, Plaintiffs note that one denial letter refers to depression, *see* Rec. 914, while another denial letter refers to "anxiety concerns," *see id.* 988, and another letter does not refer to any conditions at all, *see id.* 950. Moreover, the EOBs for Crossroads list "generalized anxiety disorder" as the diagnostic description. *Id.* 816, 822, 828, 834. Plaintiffs contend that Oxford's

---

[2] The court notes that the EOBs issued by Oxford listed three separate rationales for denying coverage at Crossroads during different periods of time:

- April 15, 2015 to July 31, 2015: lack of medical necessity. Rec. 822-23, 828-29, 834-35, 841.
- August 1, 2015 through August 31, 2015: Plaintiffs failed to timely file their claims. *Id.* 847.
- September 1, 2015 through December 23, 2015: lack of preauthorization. *Id.* 853, 859, 865, 871.

But because the initial denial letter on April 15, 2015 clearly lists medical necessity as the rationale for any denials moving forward, the court finds that this put Plaintiffs on sufficient notice of the rationale that Oxford intended to reply upon—lack of medical necessity—in denying the benefits.

decision to repeatedly consider Daniel's mental health challenges, without considering his substance abuse problems, warrants *de novo* review.

The court agrees. While at Crossroads, Daniel received treatment for (1) generalized anxiety disorder, (2) major depressive disorder, (3) cannabis use disorder, and (4) alcohol use disorder. *Id.* 1037. But Oxford failed to consider Daniel's cannabis use disorder and alcohol use disorder as an independent condition that could render his treatment at Crossroads medically necessary. Indeed, Oxford's letters cite "depression" and "anxiety concerns," but never reference any sort of substance abuse concerns. *Id.* 914, 988. And Oxford points to no claim review notes demonstrating that any of its reviewers considered Daniel's proven record of substance abuse issues in issuing their denials.[3]

The Tenth Circuit has repeatedly held that a claim administrator's denial of benefits is only entitled to a "deferential standard of review to the extent the administrator actually exercised a discretionary power vested in it by the terms of the Plan." *Spradley v. Owens-Ill. Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012); *see also LaAsmar*, 605 F.3d at 798 (holding that a "plan administrator is not entitled to the deference of arbitrary and capricious review when . . . the administrator made no decision to which a court may defer" (citations omitted)). The Tenth Circuit has also noted that, in the context of an administrator failing to issue a decision responding to the claimant's appeal of denial of benefits, "[d]eference to the administrator's expertise is inapplicable where the administrator has failed to apply his

---

[3] In fact, the only evidence that any reviewer ever considered Daniel's substance abuse problems that Oxford can identify is a citation by IPRO external reviewer that he considered "American Psychiatric Association Practice Guidelines for the Treatment of Patients with Major Depressive Disorders" and "American Psychiatric Association Practice Guidelines for the Treatment of Patients with Substance Use Disorders." Rec. 1050. But this single rationale, provided by a reviewer entirely outside of Oxford/UBH, cannot excuse Oxford's failure to consider how Daniel's diagnosed substance use disorder might have made it medically necessary for him to receive RTC care at Crossroads.

expertise to a particular decision." *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 632 (10th Cir. 2003).

As this court discussed in *Raymond M. v. Beacon Health Options, Inc.*, 463 F. Supp. 3d 1250, 1269-71 (D. Utah 2020), where a claims administrator cites one condition in denying benefits for lack of medical necessity but fails to make a determination of medical necessity for a second, independent condition, the administrator has "failed to apply his expertise to a particular decision." *Id.* at 1269 (quoting *Gilbertson*, 328 F.3d at 632). Because "a deferential standard of review [is] appropriate when a trustee exercises discretionary powers," if an administrator fails to exercise discretion by neglecting to rule on an independent basis for the claimant's demand for benefits, then a deferential standard is no longer appropriate. *Firestone Tire*, 489 U.S. at 111.

Moreover, Oxford's failure to address Daniel's substance use disorder in its benefits denials violates subsection (g) of ERISA's regulations because Oxford failed to provide the "specific reason or reasons for the adverse determination" for benefits related to substance abuse care, 29 C.F.R. § 2560.503-1(g)(1)(i), and Oxford failed to provide "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances," concerning the lack of medical necessity for RTC care for Daniel's substance use disorder, *id.* § 2560.503-1(g)(1)(v)(B).

Because Oxford arbitrarily failed to consider Daniel's dual diagnoses in denying benefits, the court will apply *de novo* review to Plaintiffs' claim for coverage at Crossroads.

### C.   Aim House

As to the denial of coverage at Aim House, Plaintiffs argue that Oxford acted irregularly by denying previously preauthorized services and by notifying Aim House of the denial, rather than Jonathan. The court rejects both arguments.

First, Plaintiffs provide no evidence that Oxford preauthorized services at Aim House aside from their own assertions. Indeed, the portion of the record cited by Plaintiffs for this proposition merely contains a statement by Plaintiffs that "[p]re-authorization for these services was completed on January 13, 2017." Rec. 1116. From this statement, it is unclear whether Plaintiffs actually received preauthorization or whether they simply submitted the preauthorization forms on January 13, 2017. Of course, submitting forms requesting preauthorization would not automatically ensure that Oxford approved the preauthorization. But even if Plaintiffs intend to aver that they received approval of their preauthorization request from Oxford, they provide absolutely no evidence of that request, nor of any approval by Oxford, in the administrative record. Indeed, the repeated calls by Plaintiffs' healthcare advocate to Oxford requesting a preauthorization denial letter indicate that Plaintiffs understood that Oxford had denied their preauthorization request.

Second, contrary to Plaintiffs' assertions, Oxford notified Plaintiffs of its denial of coverage. Oxford sent a letter dated January 18, 2017, addressed to Daniel, explaining the denial of benefits. Although Oxford mailed the letter to the Aim House address in Colorado instead of mailing the letter directly to Jonathan, this error is not the sort of "serious procedural irregularity requiring de novo review." *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1251 (D. Utah 2016). At bottom, Oxford addressed the letter to one of the Plaintiffs (Daniel) and mailed it to a known address for Daniel.

Finding no serious procedural irregularity that would warrant *de novo* review, the court will apply arbitrary and capricious review to Oxford's denial of benefits for Aim House.

## II.     DENIAL OF BENEFITS CLAIMS

The court begins by addressing Plaintiffs' claims for denial of benefits at Open Sky and Crossroads, then turns to Plaintiffs' claim for denial of benefits at Aim House.

### A.     *De Novo Review of Denial of Benefits at Open Sky and Crossroads*

The court reviews Oxford's denial of benefits at Open Sky and from April 15, 2015 to July 31, 2015 at Crossroads under the *de novo* standard of review. "When applying a de novo standard in the ERISA context, the role of the court reviewing a denial of benefits is to determine whether the administrator made a correct decision." *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (unpublished) (citation omitted). The *de novo* "standard is not whether 'substantial evidence' or 'some evidence' supported the administrator's decision." *Id.* at 833. Rather, "it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review." *Id.* at 833; *see also Ray v. UNUM Life Ins. Co. of Am.*, 224 F. App'x 772, 782 (10th Cir. 2007) (unpublished) (approving of district court's application of preponderance of evidence standard).

#### i.     *Open Sky*

The court conducts a *de novo* review of Oxford's denial of benefits at Open Sky, taking into consideration the Plan's requirements as to claim submission deadlines, preauthorization, and medical necessity.

First, the Plan lays out the following "Timeframe for Filing Claims":

Claims for services must be submitted to Us for payment within 120 days after You receive the services for which payment is being requested. If it is not reasonably possible to submit a claim within the 120 day period, You must submit it as soon as reasonably possible.

23

Rec. 1171. Plaintiffs submitted claims for services rendered between January 15, 2015 and April 7, 2015 on April 21, 2015, well within the 120-day timeframe set by the Plan. Plaintiffs, however, erroneously excluded January 8, 2015 to January 14, 2015 in their initial claim submissions. Once Plaintiffs realized they had inadvertently excluded those dates of service from their claims, Plaintiffs submitted a corrected claim for dates of service January 8, 2015 through January 31, 2015 on June 10, 2015, which falls around a month after the 120-day deadline.

New York law governs interpretation of the Plan. *Id.* 131. And New York has adopted a notice-prejudice standard for insurance policies issued or delivered in New York on or after January 19, 2009. *See Castillo v. Prince Plaza, LLC*, 981 N.Y.S.2d 906, 908 (N.Y. Sup. Ct. 2014) (discussing adoption of New York's notice-prejudice law); *see also* N.Y. INS. LAW § 3420(a)(5) ("A provision that failure to give any notice required to be given by such policy within the time prescribed therein shall not invalidate any claim made by the insured . . . unless the failure to provide timely notice has prejudiced the insurer."); *see also Dang v. UNUM Life Ins. Co. of Am.*, 175 F.3d 1186, 1188 (10th Cir. 1999) ("The 'notice-prejudice rule' . . . provides, with some minor state-to-state variations, that an insurance company may not avoid liability on the basis of the insured's filing of untimely notice and proof of claim without a showing of actual prejudice by the delay."). In this instance, Oxford was already aware that Daniel was receiving care at Open Sky based on Plaintiffs' prior timely claim submissions. Oxford can demonstrate no prejudice from the fact that Plaintiffs merely added a week to the claims already submitted. Accordingly, Plaintiffs' claims cannot be denied based on untimeliness.

Second, the Plan notes that "[p]reauthorization is required before You receive certain Covered Services." Rec. 43, 197. Such "covered services" include non-emergency mental health and substance use disorder services. *Id.* 28-29, 178. If an insured fails to request preauthorization

for out-of-network services, Oxford "will pay an amount of $500 less than We would otherwise have paid for the care, or We will pay only 50% of the amount We would otherwise have paid for the care, whichever results in a greater benefit for You." *Id.* 302. However, Oxford will pay that amount "only if [Oxford] determine[s] the care was Medically Necessary even though You did not seek Our Preauthorization." *Id.* In other words, "[i]f We determine that the services were not Medically Necessary, You will be responsible for paying the entire charge for the service." *Id.* Accordingly, the effect of Plaintiffs' failure to obtain preauthorization turns on whether the services were medically necessary.

The parties focus their arguments on whether the wilderness therapy offered at Open Sky constituted an "experimental or investigational" treatment considered not medically necessary by the Plan. *Id.* 533-34. But the court need not reach that question. The administrative record fails to demonstrate that Daniel's treatment was medically necessary—regardless of whether his wilderness therapy program qualified as a nonexperimental RTC.

Plaintiffs point to (1) medical records and (2) letters from providers in support of their contention that Daniel's treatment at Open Sky was medically necessary. But the only medical records from Open Sky that Plaintiffs cite are Daniel's treatment plan, *id.* 3583-88, and Daniel's discharge summary, *id.* 3590-93; *see also id.* 3509 (finding that "[t]he medical records for MH residential treatment at Open Sky Wilderness Therapy were scant."). Daniel's treatment plan outlines goals and interventions for Daniel but contains no clinical evaluation of Daniel's state at the time he arrived at Open Sky. Accordingly, it does not assist the court in determining whether Daniel's treatment at Open Sky was medically necessary based on his condition at the time. And Daniel's discharge summary provides an overview of Daniel's care at Open Sky, but similarly includes very little evidence of Daniel's state while at Open Sky. For instance, it describes how

Daniel "participated in regular feelings checks, completed therapy assignments on identifying feelings, and used 'I feel' statements on a regular basis with staff and peers." *Id.* 3591. It also discussed how Daniel "participated in therapy groups that addressed drug and alcohol issues and engaged in individual sessions with both Open Sky field guides and therapist regarding these issues." *Id.* But the general discharge notes include no evidence that Daniel received any treatment that could not have taken place in the outpatient setting. Accordingly, the medical records that Plaintiffs cite provide the court no basis on which to conclude that Daniel's treatment at Open Sky was medically necessary.

Although Plaintiffs did not cite to them, the administrative record also contains weekly notes from Daniel's therapist at Open Sky, Tim Mullins, MA. *See id.* 599-640. But, just as with Daniel's other records from Open Sky, the notes do not indicate why the "'why now' factors leading to admission [could] not be safely, efficiently or effectively addressed and/or treated in a less intensive setting." *Id.* 3783. As a threshold matter, the administrative record does not clearly indicate the "why now" factors that precipitated Daniel's need for RTC-level care at the particular time he entered Open Sky. Daniel was hospitalized twice, but both times occurred over a year before he began at Open Sky. Daniel also had a run-in with law enforcement related to his drug use, but that incident occurred over a month before Plaintiffs sent Daniel to Open Sky. Indeed, the only "why now" factor that Plaintiffs identify in the record is that "on December 27th, Daniel showed disrespect to Jonathan and that was what finally prompted us to insist Daniel leave the house." *Id.* 3554. But such an incident does not reflect the "acute changes in the member's signs and symptoms and/or psychosocial and environmental factors" necessary for RTC care under the Plan. *Id.* 3783.

Nor is there any evidence that Daniel had the sort of "[a]cute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered," which is an admission criteria for RTC-level care under the Optum Level of Care Guidelines. *Id.* 1014. Daniel's medical records while at Open Sky do not indicate that Daniel was engaging in risky or aggressive behavior, considering self-harm, or actively attempting to obtain drugs while at Open Sky.[4] Moreover, the record does not indicate that Daniel's diagnoses interfered with his activities of daily living. Finally, there is no indication that Daniel met with a psychiatrist—or any other mental health professional besides Tim Mullins—while at Open Sky, despite the fact that the Optum Level of Care Guidelines for RTC care indicate that best practices include that "[a] psychiatric consultation occurs at least weekly commensurate with the member's needs." *Id.* 3784. Accordingly, Daniel's medical records while at Open Sky simply do not support a finding that Daniel necessitated 24-hour care at an RTC facility.

Plaintiffs also cite to two letters from Daniel's providers as evidence that Daniel's care at Open Sky was medically necessary. As an initial matter "[n]othing in [ERISA] itself . . . suggests that plan administrators must accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). "Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Id.* But, even granting the letters considerable weight, they cannot support a finding of medical necessity. First, a clinical nurse specialist who treated Daniel prior to his admission at

---

[4] Indeed, the only evidence that the court can glean from Daniel's medical records at Open Sky that *might* support a need for residential treatment is that Mullins initially notes that "Daniel is maintaining that he wants to continue to smoke pot and minimizes any other drug use." Rec. 602. But in the absence of any other evidence from Daniel's records at Open Sky that he engaged in the kinds of behavior that would require 24-hour care, the court cannot rely on this single sentence from Daniel's therapist to authorize benefits.

Open Sky, Jayne Eliach, states that she recommended Daniel attend Open Sky after his first semester in college. Rec. 3789. While Eliach notes Daniel's "family tension and substance abuse," she offers little evidence as to why Daniel needed specifically residential-level treatment. *Id.* Second, Tim Mullins, Daniel's counselor at Open Sky, provided a short, retrospective description of Daniel's progress at Open Sky. *Id.* 657. He also recommended that Daniel continue in a transitional living environment. *Id.* Mullins cited Daniel's "defiance," "definitive substance use problems—primarily cannabis," and "profound attachment issues." *Id.* But Mullins's letter contains no specifics as to why Daniel's treatment at Open Sky could not have occurred in a less restrictive environment. Rather, it focuses on the future—that Daniel should remain in "continued care" in order to avoid a relapse into "substance use, worsening self-image, and debilitating anxiety." *Id.*

At bottom, this court is tasked with deciding "whether the administrator made a correct decision." *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (unpublished) (citation omitted). The court recognizes that Daniel clearly needed mental health and substance abuse treatment. But the question here is whether Daniel could have been treated at a lower level of care. And Plaintiffs simply have not submitted sufficient medical evidence from Daniel's time at Open Sky to demonstrate that Daniel necessitated an RTC level of care. Accordingly, the court DENIES Plaintiff's motion for summary judgment on the denial of benefits claim as to Daniel's time at Open Sky and GRANTS Defendant's corresponding motion.

### ii. *Crossroads*

The court also applies the *de novo* standard of review to the denial of benefits at Crossroads. The court considers the 2015 Optum Level of Care Guidelines for Residential Treatment Centers for Mental Health Conditions to evaluate Daniel's care at Crossroads in light

of Daniel's multiple diagnoses and the evidence in the administrative record. Plaintiffs urge the court to overturn the denial of benefits because Daniel's provider at Open Sky recommended further treatment, and Daniel's discharge summary at Open Sky outlined the plan to help Daniel succeed upon discharge, which included treatment at Crossroads.

But Plaintiffs fail to identify evidence in the administrative record that demonstrates "impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered" or "[p]sychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care." *Id.* 3573. Plaintiffs primarily cite to Daniel's discharge summary at Open Sky, which recommended that Daniel "attend a young adult transition program/residential therapeutic program" upon discharge. *Id.* 594. And Oxford covered Daniel's initial week at such a program. But Plaintiffs point to no evidence in Daniel's medical records from Crossroads that indicates a continued need for residential care.

Indeed, Daniel's therapist reported generally positive progress in Daniel's ability to address both his mental health and substance abuse diagnoses. Regarding Daniel's mental health, his therapist stated that Daniel "was rational and appropriate with his thinking" and "was able to discuss his anxiety with making the decision to stay [at Crossroads]." *Id.* 3599. And on September 9, 2015, Daniel "was able to discuss something that was uncomfortable and recognize that it is his current anxiety and thinking that is causing the problem to increase." *Id.* 3600. Regarding his substance use problems, his therapist noted that Daniel "was reflective with his past use, why it is unmanageable, and how substance changes things." *Id.* 3601. And Daniel's therapist further reported that Daniel "was thoughtful about the benefits of being sober and why

he feels like building relationships is important." *Id.* 3934. Daniel was able to recognize that "I know that I have to stay sober and I want too [sic]," while his therapist notes that Daniel "was insightful about his current triggers." *Id.* 3967. Such evidence supports a finding that Daniel was marking positive progress and no longer necessitated 24-hour care.

Moreover, Daniel was able to go on multiple successful home visits while at Crossroads, *see id.* 3807, 3970, 3976, 3996, which "could reasonably be interpreted as evidence that [Daniel], with the support of his family, could have managed his symptoms at a lower level of care." *Julie L. v. Excellus Health Plan, Inc.*, 447 F. Supp. 3d 38, 50 (W.D.N.Y. 2020) (citing *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, No. 1:09-cv-101, 2010 WL 5300897, at *3 (D. Utah Dec. 22, 2010) (explaining that evidence that child went on "therapeutic leave for some time each month during the remainder of his stay . . . could be viewed as demonstrating that he was able to adequately care for his own needs and that his family support system was also able to fulfill those needs")).

Daniel, of course, hit some bumps in the road along the way. He displayed irrational thinking at times. *See, e.g.*, Rec. 3930. And one day he bought lemon extract from the store to attempt to ingest it for its alcohol content. *Id.* 3842. But the fact that Daniel continued to suffer from some behavioral issues does not demonstrate that Daniel's continued residential treatment care was medically necessary. Indeed, the record contains no evidence that Daniel's behavior was impaired to the level that it interfered with activities of daily living or endangered others, as outlined in the Optum Care Guidelines. Daniel needed support, particularly to manage his substance use disorder, but the record simply does not indicate that Daniel could not have been treated at a lower level of care. Accordingly, the court DENIES Plaintiffs' motion for summary

judgment on the denial of benefits claim as to Daniel's time at Crossroads and GRANTS Defendant's corresponding motion.

### B.    *Arbitrary and Capricious Review of Aim House Coverage*

Applying arbitrary and capricious review means that this court will uphold the administrator's determination "so long as it is predicated on a reasoned basis." *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006). "The Administrator's decision need not be the only logical one nor even the best one" as long as it is "sufficiently supported by facts within his knowledge." *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004) (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)). In fact, Oxford need only show that its "decision resides somewhere on a continuum of reasonableness—even if on the low end." *Adamson*, 455 F.3d at 1212 (citation omitted).

In addition to considering whether the decision is predicated on a reasoned basis, the court must also consider whether the decision is rooted in substantial evidence because a lack of substantial evidence indicates an arbitrary and capricious decision. *Id.* "Substantial evidence means more than a scintilla . . . yet less than a preponderance." *Id.*

Oxford's internal notes indicate that "Sara . . . from . . . Aim House" called for authorization for transitional living coverage at Aim House. Rec. 3525. Oxford "confirmed that this is not a request for IOP [intensive outpatient program], PHP [partial hospitalization program], or any other form of t[reatment] and is for transitional living only." *Id.* Based on Aim House's representation that it provided transitional living services, Oxford denied Plaintiffs' claim for coverage at Aim House because "coverage is not available under your benefit plan for the requested services of transitional living." *Id.* 1109. Specifically, Oxford wrote that "[a]s

described in the exclusion section of your Certificate of Coverage for New York City Specialized Dentistry; Transitional living which is a domiciliary service is not a covered benefit." *Id.*

"[T]he factual determination of eligibility for benefits is decided solely on the administrative record." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010). And the administrative record simply contains no evidence from which the court can conclude that Daniel received any medical care at Aim House. Indeed, the only evidence related to Aim House is the representation from an Aim House employee that the facility was not providing Daniel any form of treatment. Plaintiffs argue that the services Daniel received "were therapeutic, directed to address his depression, anxiety, and a substance use disorder." ECF No. 140 at 32. But Plaintiffs' argument is simply not supported by the record. The court does not have any medical records before it that would indicate what kinds of services Daniel received at Aim House, much less that Daniel did, in fact, receive some sort of mental health or substance abuse treatment at Aim House. It is eminently reasonable for a medical insurance plan to deny coverage where no treatment is being provided. Accordingly, the court DENIES Plaintiffs' motion for summary judgment on the denial of benefits claim as to Daniel's time at Aim House and GRANTS Defendant's corresponding motion.

*          *          *

In sum, the court GRANTS Oxford's motion for summary judgment and DENIES Plaintiffs' motion for summary judgment on Plaintiffs' ERISA claims for denial of benefits at all three facilities.

### III.    PARITY ACT CLAIMS

Both parties also move for summary judgment on Plaintiffs' Parity Act claims. The Parity

Act requires that a plan that provides for "both medical and surgical benefits and mental health

or substance use disorder benefits" must not impose more restrictive treatment limitations on the

latter than it imposes on the former. 29 U.S.C. § 1185a(a)(3)(A). As Judge Shelby noted, "in

effect, the Parity Act prevents insurance providers from writing or enforcing group health plans

in a way that treats mental and medical health claims differently." *David S. v. United Healthcare*

*Ins. Co.*, No. 2:18-cv-803, 2019 WL 4393341, at *3 (D. Utah Sept. 13, 2019) (citing *Munnelly v.*

*Fordham Univ. Fac.*, 316 F. Supp. 3d 714, 728 (S.D.N.Y. 2018) ("Essentially, the Parity Act

requires ERISA plans to treat sicknesses of the mind in the same way that they would a broken

bone." (citation and alterations omitted))).

At the motion to dismiss stage, the parties agreed on a three-part analysis that the court

would apply in this case. *See* ECF No. 67 at 27. Specifically, Plaintiffs must (1) identify a

specific treatment limitation on mental health benefits; (2) identify medical/surgical care covered

by the Plan that is analogous to the mental health/substance abuse care for which Plaintiffs seek

benefits; and (3) demonstrate a disparity between the treatment limitation on mental

health/substance abuse benefits as compared to the limitations that Defendant would apply to the

covered medical/surgical analog. *Id.* at 27-28. This standard reflects the four-part test utilized by

other courts in this district: Plaintiffs must demonstrate that (1) the Plan is subject to the Parity

Act; (2) the Plan provides benefits for both mental health and medical/surgical treatments; (3)

Defendants placed differing and more restrictive limitations on benefits for mental health care as

compared to medical/surgical care; and (4) the mental health benefit being limited is of the same

classification as the comparable medical/surgical benefit. *See Michael D. v. Anthem Health Plans*

*of Ky., Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019) (citing framework laid out in *A.H. ex rel. G.H. v. Microsoft Corp. Welfare Plan*, No. C17-1889-JCC, 2018 WL 2684387, at *6 (W.D. Wash. June 5, 2018), and noting that "there is no clear law on what is required to state a claim for a Parity Act violation" but that many courts follow the "baseline standard" laid out in *A.H.*).

Plaintiffs offer three rationales for finding a Parity Act violation. First, Plaintiffs argue that Oxford facially violated the Parity Act by placing a more restrictive limitation on mental health care by including a blanket exclusion on wilderness therapy programs for mental health treatment. Second, Plaintiffs argue that Oxford committed an as-applied Parity Act violation by requiring Daniel to exhibit acute symptoms to qualify for RTC care at Open Sky and Crossroads whereas Oxford does not require similarly acute symptoms for comparable medical-surgical treatment. Third, Plaintiffs argue that Oxford facially violated the Parity Act by excluding coverage at transitional living facilities for mental health care while allowing coverage for comparable medical-surgical facilities. The court addresses each rationale in turn.

### A.    *Parity Act Claims at Open Sky and Crossroads*

In their briefing, Plaintiffs ask the court to grant both monetary and unspecified equitable relief based on Oxford's alleged violations of the Parity Act. To the extent Plaintiffs seek monetary relief based on their Parity Act claims related to Daniel's treatment at Open Sky and Crossroads, Plaintiffs fail. Plaintiffs cannot establish standing for those claims. As with any other plaintiff, a plaintiff bringing a claim under any ERISA provision, including the Parity Act, must have standing pursuant to Article III of the United States Constitution. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020) ("There is no ERISA exception to Article III."). To have standing under Article III, a plaintiff must demonstrate that (1) she has suffered an actual or threatened injury in fact; (2) the injury is causally connected to the conduct complained of; and (3) it is

likely, and not merely speculative, that her injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

To demonstrate an injury-in-fact where a plaintiff seeks monetary relief, she must "demonstrate individual loss" caused the Parity Act violation. *See Michael W. v. United Behavioral Health*, 420 F. Supp. 3d 1207, 1221 (D. Utah 2019). But the court has already determined that Plaintiffs suffered no loss with regard to the claims at Open Sky and Crossroads because Plaintiffs failed to demonstrate that Daniel's care at those facilities qualified as medically necessary. Moreover, Plaintiffs have failed to demonstrate causation. Even if Plaintiffs could demonstrate an economic loss, a Parity Act violation could not have caused Plaintiffs any monetary injury because there was no nexus between the allegedly violative language and Oxford's decision to deny benefits. In other words, any alleged Parity Act violations did not cause Oxford to wrongfully deny benefits. As discussed above, Oxford properly denied benefits for treatment at Open Sky and Crossroads because it was not medically necessary.[5] Accordingly, Plaintiffs may not seek monetary relief for Parity Act claims related to Daniel's treatment at Open Sky and Crossroads.[6]

---

[5] First, the court found that the administrative record fails to demonstrate that Daniel's RTC-level care at Open Sky was medically necessary—regardless of whether it occurred at a wilderness therapy program. Second, Plaintiffs fail to identify evidence in the administrative record that supports a finding that Daniel's care at Open Sky and Crossroads qualified as medically necessary, even under the Plan's stated medical necessity requirements for RTC care (not the more acute standards Plaintiffs allege that Oxford actually applied).

[6] The parties have not yet briefed Plaintiffs' standing to pursue equitable relief for Parity Act claims in the context of a finding of no wrongful denial of benefits. Because the question of standing is intimately related to the availability of equitable relief under the Parity Act, the parties may address this topic in the further briefing requested below. For the purposes of this order, the court will consider only whether an alleged Parity Act violation occurred, not the issue of standing.

### i.  Wilderness Treatment Exclusion

Plaintiffs first argue that skilled nursing facilities are the proper intermediate-care analog to wilderness therapy.[7] *See* ECF No. 151 at 9. While Oxford contends that Plaintiffs have not demonstrated that skilled nursing facilities are analogous to residential treatment programs, Oxford cites only to one case holding that residential treatment care is not analogous to *hospice* care. *See* ECF No. 132 at 50 (citing *Charles W. v. United Behavioral Health*, 2019 WL 6895331, at *5 n.3 (D. Utah Dec. 18, 2019)). Indeed, several courts have found that skilled nursing facilities constitute a proper surgical-medical analog to residential treatment centers. *See M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1030-31 & n.209 (D. Utah 2021) (noting that, although not statutorily required, "many have come to accept as a matter of law that skilled nursing facilities and inpatient rehabilitation are the relevant analog to residential treatment for mental health"); *L.P. ex rel. J.P. v. BCBSM, Inc.*, No. 18-cv-1241, 2020 WL 981186, at *6 (D. Minn. Jan. 17, 2020) ("[T]he overview to the Final Rules helpfully identifies skilled nursing facilities as the proper analogue to residential treatment facilities." (citing Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 Fed. Reg. 68,247 (Nov. 13, 2013))), *report and recommendation adopted*, No. CV 18-1241, 2020 WL 980171 (D. Minn. Feb. 28, 2020); *Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155, 1158-59 (9th Cir. 2018) (comparing provision of room and board reimbursement at skilled nursing facilities to residential treatment facilities for mental health patients). Accordingly, the court considers skilled nursing facilities as the medical-surgical analog.

---

[7] Plaintiffs initially included inpatient rehabilitation centers and inpatient hospice care as additional medical/surgical analogs. But Plaintiffs appear to drop that argument in their reply brief. *See* ECF No. 151 at 9 ("There is no question skilled nursing is the proper analog to wilderness therapy.").

And there is no evidence that Oxford would deny medical-surgical benefits in a skilled nursing facility simply because the care took place in a wilderness setting. Indeed, Oxford's Clinical Policy for Wilderness Therapy specifically indicates that it is "not medically necessary *for the treatment of emotional, addiction, and/or psychological problems*." Rec. 706 (emphasis added). But nowhere in the volumes of pages outlining policies for skilled nursing facilities does Oxford indicate any limitation on skilled nursing facilities simply because the treatment involves care outdoors. In other words, Plaintiffs claim that Oxford created an exclusion for wilderness treatment that only applies to behavioral health programs, in violation of the Parity Act.

This case stands in stark contrast to *Peter M. v. Aetna Health & Life Insurance Co.*, 554 F.Supp.3d 1216 (D. Utah 2021). In that case, the wilderness treatment exclusion was listed under the general heading for "Medical Plan Exclusions." *Id.* at 1220. And the wilderness treatment exclusion applied to mental health benefits, as well as medical-surgical care. *Id.* at 1227. Specifically, the Plan excluded medical-surgical wilderness programs such as weight management programs, treatment for adolescent long-term childhood cancer survivors, diabetes treatment, and treatment of traumatic brain injuries. *Id.* Here, Oxford has failed to identify a single medical-surgical wilderness treatment excluded by the Plan. Indeed, the clinical policy itself appears to limit the exclusion solely to mental health benefits.

This case presents a scenario much more comparable to *Joseph F. v. Sinclair Services Co.*, 158 F. Supp. 3d 1239 (D. Utah 2016). In that case, the court found that the relevant plan's residential treatment facility exclusion violated the Parity Act because the plan provided treatment at skilled nursing facilities—which did not treat mental health or substance use disorders—but not at residential treatment facilities—which treat only mental health and substance use disorders. *Id.* at 1261. Just as here, the plan attempted to place a blanket exclusion

on a particular type of care offered only for mental health and substance use treatment. *See id.*; *see also Julie L. v. Excellus Health Plan, Inc.*, 447 F. Supp. 3d 38, 57 (W.D.N.Y. 2020) ("[T]he cases cited are consistent with the Court's own research demonstrating that cognizable Parity Act claims exist where plans categorically exclude therapies or residential treatment facilities which, in effect, are exclusions only applicable to mental health conditions."). The *Joseph F.* court rejected as "illusory" the defendant's argument that the exclusion applied across the board after the defendant provided no evidence to suggest that it would have also denied residential treatment benefits for medical or surgical conditions under the exclusion. *Joseph F.*, 158 F. Supp. 3d at 1262. And here, the question is clearer—the clinical policy explicitly covers only mental health benefits.

Oxford points to the medical necessity requirement in the Plan to posit that wilderness therapy is not medically necessary and thus the Plan cannot provide coverage. But Oxford cannot not demonstrate that *every* wilderness therapy program fails the Plan's medical necessity requirements. To the extent a wilderness therapy plan provides the same services as a conventional RTC program—medication management, regular access to a psychiatrist, and extensive therapy sessions, for example—then denying coverage at such a facility simply because the treatment occurs outdoors (where such a limitation does not apply to medical-surgical benefits) violates the Parity Act. At bottom, Oxford must conduct an individualized evaluation of a wilderness therapy facility in order to ascertain whether it qualifies as medically necessary under the Plan. Some wilderness therapy facilities certainly fail to offer sufficient medical care. But others may offer the same elements as a conventional RTC program while

incorporating a wilderness component.[8] Oxford simply has not submitted evidence demonstrating that wilderness therapy programs, as a rule, fail to provide the kinds of services required for a medically necessary RTC. Therefore, Oxford cannot rely on the Plan's medical necessity provision to argue that the wilderness therapy exclusion is simply the result of a neutral application of the Plan's medical necessity provision.

Accordingly, the court finds that the blanket wilderness therapy exclusion facially violates the Parity Act because the exclusion is a "separate treatment limitation[] that [is] applicable only with respect to mental health . . . benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii).[9]

### ii.    *Acute Symptoms Requirement*

Plaintiffs further argue that Oxford improperly required Daniel to exhibit acute symptoms to qualify for RTC care at Open Sky and Crossroads whereas Oxford does not require similarly acute symptoms for comparable medical-surgical treatment. As evidence of the alleged acute symptoms requirement, Plaintiffs point to the rationale for denial of coverage at Crossroads, where Oxford justified its denial by stating that

> You were admitted for treatment of Depression. It is reported that you made progress and no longer need the type of care and services provided in this setting. You are not a danger to self or others. You have no medical issues.

---

[8] For instance, academic studies have defined wilderness therapy as simply "[t]he use of traditional therapy techniques, especially group therapy techniques, in a wilderness setting." Rec. 730. In other words, "[a] key component of [wilderness therapy] is that clients receive individual and group therapy provided by a mental health professional." *Id.* And "[t]he therapy component in [wilderness therapy] is similar to other licensed residential treatment facilities." *Id.* "These similarities include consistent contact (one-on-one or in a group) with a licensed mental health practitioner, communication from that practitioner to the client's family, individualized treatment plans for each client, a formal evaluation of treatment effectiveness, and an aftercare plan." *Id.*

[9] Plaintiffs also contend that Oxford violated the Parity Act by wrongfully claiming that Daniel's treatment at Open Sky was experimental and investigational. But whether Oxford properly applied its Plan terms to Daniel's case goes to a denial of benefits claim, not a Parity Act claim. And as discussed above, the administrative record fails to demonstrate that Daniel's inpatient treatment was medically necessary—regardless of whether it occurred at a wilderness therapy program.

Rec. 914. Plaintiffs apply the same analysis to Oxford's evaluation of Daniel's coverage for treatment at Open Sky. Oxford denied benefits at Open Sky because "[y]ou were not thinking about hurting yourself or others" and "[y]ou were not hearing or seeing things that others do not." *Id.* 387. For contrast, Plaintiffs cite to Oxford's policies for skilled nursing facilities, which repeatedly state that skilled nursing facility coverage can be provided only where "[t]here are no acute hospital care needs." *See, e.g.*, *id.* 1462. Plaintiffs argue that by requiring Daniel to present a danger to self or others, i.e., suicidal or homicidal ideation, or to be experiencing hallucinations, Oxford required an elevated severity of symptoms not required for analogous medical-surgical benefits.

As an initial matter, the Plan evidences no facial violation of the Parity Act (and Plaintiffs do not argue otherwise). To provide coverage for RTC-level care, the Plan requires that "[t]he member is not at imminent risk of serious harm to self or others," but "[t]he member has a co-occurring medical disorder or substance use disorder which complicates treatment of the presenting mental health condition to the extent that treatment in a Residential Treatment Center is necessary." *Id.* 1288. The Plan outlines parallel requirements for medical-surgical care at a skilled nursing facility: "There are no acute hospital care needs" but "[t]here are intense and complex care needs." *Id.* 1462.

In practice, however, Oxford applied a more stringent burden to Plaintiffs' claims for care at Open Sky and Crossroads than outlined in its Plan. Indeed, the Plan requires that the member present no imminent risk of serious harm to self or others in order to provide coverage at an RTC facility. But Oxford *denied* coverage based upon the rationale that Daniel was not a danger to self or others and did not display suicidal or homicidal ideation. *See id.* 387 ("You were not thinking about hurting yourself or others."). Suicidal ideation, homicidal ideation, and

hallucinations are acute symptoms. Indeed, Oxford's rationale for denying Daniel coverage at RTC-level facilities more closely mirrors the requirements outlined for inpatient mental health care treatment: that "[t]he member is at imminent risk of harm to self or others as evidenced by . . . current suicidal ideation [or] recent and seriously physically destructive acts." *Id.* 1288.

Moreover, the skilled nursing facility guidelines require that a patient present with "no acute hospital care needs" in order to receive coverage at a skilled nursing facility. *See, e.g.*, *id.* 1462. Accordingly, Oxford would deny skilled nursing coverage for a medical-surgical patient who presented with acute hospital care needs. But, here, Oxford denied mental health care to a patient precisely because he *failed* to present with acute care needs.

Oxford contends that when its RTC guidelines use the word "acute," it refers to sudden onset (as opposed to chronic) symptoms, not to "acute" in the sense that it is used for in-patient hospitalization criteria. But the evidence belies that argument. Oxford's reviewers did not search for sudden onset symptoms. Rather, they required acute symptoms—like psychosis or suicidal or homicidal ideation—that would qualify for inpatient hospitalization in order to approve coverage for RTC-level care.

In other words, although the Plan purports to impose comparable limitations on treatment at RTC programs and skilled nursing facilities, in actuality, Oxford imposed a more stringent limitation on RTC care that more closely resembled the requirements for acute inpatient mental health care. Such a disparity between the requirements for mental health coverage and medical-surgical coverage runs afoul of the Parity Act.

### iii.   Remedies

As for the appropriate remedy, Plaintiffs argue in their briefing that "[t]he exact form of appropriate equitable relief may have to await the Court's ruling on the Plaintiffs denied benefits

41

claim." ECF No. 128 at 41. At oral argument, when the court asked what equitable relief Plaintiffs would seek in the event that the court found only a Parity Act violation, not a denial of benefits violation, Plaintiffs did not articulate specific relief other than a declaration that the wilderness therapy exclusion or the acute symptoms requirement violated the Parity Act. Nor did Plaintiffs express whether relief should differ for a facial versus an as-applied violation. Oxford did not address the appropriate equitable remedy for a Parity Act violation in its briefing. At oral argument, counsel for Oxford contended that a denial of benefit violation is a prerequisite for granting any Parity Act remedies. *But see Anne M. v. United Behavioral Health*, 2:18-cv-808, 2019 WL 1989644, at *3 (D. Utah May 6, 2019) ("[T]he relief that can be sought under § 1132(a)(3) is even broader than that available under § 1132(a)(1)(B) and does not depend on the recovery of benefits due to the plan participant or beneficiary.").

Accordingly, the court enters a factual finding that the (1) the wilderness therapy exclusion in the Plan constitutes a facial violation of the Parity Act and (2) the application of more stringent limitations on RTC care constitutes an as-applied violation of the Parity Act. Within ten days of this order, Plaintiffs may submit supplemental briefing of no more than ten pages as to what, if any, equitable relief they seek. Defendants shall then have ten days to file a response of no more than ten pages. The court will not entertain any requests for extensions or increased page limits.

### B.     *Parity Act Claim at Aim House: Transitional Living Exclusion*

Plaintiffs argue that Oxford applied a domiciliary exclusion to Daniel's treatment at Aim House despite the fact that the domiciliary exclusion in the Plan "does not apply to transitional living facilities or other facilities that treat mental health and substance use disorder conditions." ECF No. 128 at 40. But the court need not reach the question of exclusions because Plaintiffs

have submitted absolutely no evidence that Aim House provided mental health or substance use treatment. Indeed, the only evidence in the record states that the facility would not provide any type of treatment. The Plan simply does not provide coverage for care that does not involve medical, mental health, or substance abuse treatment.

Plaintiffs further contend that by excluding transitional living services, Oxford has essentially eliminated coverage for a level of care for treatment of mental health and substance use disorders. But, as discussed above, Oxford simply declined to cover bills for care that, Aim House admitted, did not involve any treatment. Absent any evidence that Aim House provided mental health or substance abuse treatment, the court cannot find a Parity Act violation.

The same analysis applies to Plaintiffs' argument that, while custodial care can be excluded under the terms of the Plan, "the problem for Oxford is that it denied benefits claiming that Daniel received custodial care when he did not." ECF No. 140 at 32. In addition to raising an as-applied, rather than facial, challenge, this argument fails because there is simply no record evidence—besides Plaintiffs' exhortations—that Daniel received therapeutic, not custodial, services at Aim House. Presumably Plaintiffs had in their control any medical records from Aim House. Yet these records, if they exist, are not in the administrative record. And, as Plaintiffs' counsel agreed at oral argument, the court must consider whether contemporaneous medical records support conclusory statements by either party. Accordingly, the court DENIES Plaintiffs' motion for summary judgment on its Parity Act claim as to Aim House and GRANTS Defendants' corresponding motion.

**CONCLUSION**

For the foregoing reasons, the court GRANTS Defendant's motion for summary judgment as to denial of benefits and DENIES Plaintiffs' corresponding motion for summary judgment. The court will entertain the further briefing described above on the Parity Act claims.

DATED July 7, 2022.

BY THE COURT

Jill N. Parrish
United States District Court Judge